

1  Joseph W. Cothchett (36324; jcotchett@cpmlegal.com)
   Mark C. Molumphy (168009; mmolumphy@cpmlegal.com)
2  Nanci E. Nishimura (152621; nnishimura@cpmlegal.com)
   Douglas Y. Park (233398; dpark@cpmlegal.com)
3  **COTCHETT, PITRE & McCARTHY**
   840 Malcolm Road, Suite 200
4  Burlingame, CA 94010
   Telephone: (650) 697-6000
5  Facsimile:  (650) 697-0577

6  Walter J. Lack (57550; wlack@elllaw.com)
   Elizabeth L. Crooke (90305; ecrooke@elllaw.com)
7  Richard P. Kinnan (123170; rkinnan@elllaw.com)
   **ENGSTROM, LIPSCOMB & LACK**
8  10100 Santa Monica Blvd., 16th Floor
   Los Angeles, CA 90067
9  Telephone: (310) 552-3800
   Facsimile:  (310) 552-9434

10

11  *Attorneys for Plaintiff GREG SARANDI, Trustee of Next Phase
    Marketing, Inc. Defined Benefit Plan and Trust,
12  derivatively on behalf of Novartis AG (Novartis, Inc.)*

13              **UNITED STATES DISTRICT COURT**

14              **NORTHERN DISTRICT OF CALIFORNIA**

15                 **SAN FRANCISCO DIVISION**

16

17  **GREG SARANDI, Trustee of Next Phase Marketing**      Case No.   **2118**
    **Inc. Defined Benefit Plan and Trust**, derivatively and
18  on behalf of Novartis AG (Novartis. Inc.),

19         Plaintiff,                                       **SHAREHOLDER
                                                             DERIVATIVE
                                                             COMPLAINT**
20  vs.

21  **RAYMOND BREU, BIRGIT BREUEL,**                        **DEMAND FOR JURY TRIAL**
    **PETER BURCKHARDT, SRIKANT DATAR,**
22  **WILLIAM W. GEORGE, ALEXANDRE F.**
    **JETZER, PIERRE LANDOLT, ULRICH LEHNER,**
23  **HANS-JOERG RUDLOFF, HELMUT SIHLER,**
    **DANIEL VASELLA, WENDELIN WIEDEKING,**
24  **ROLF M. ZINKERNAGEL,**
    **and Does 1-50, inclusive,**
25
           Defendants,
26
    and
27
    **NOVARTIS AG (Novartis, Inc.),**
28
           Nominal Defendant.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  INTRADISTRICT ASSIGNMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.  PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.  Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.  Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.  Unnamed Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    D.  Agency and Aiding and Abetting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    E.  Doe Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V.  FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.  The Close Relationship Between Novartis and Chiron . . . . . . . . . . . . . 11

    B.  The Approved Use Of TOBI To Treat Cystic Fibrosis . . . . . . . . . . . . . 13

    C.  Defendants' Promotion of Off-Label Uses of Drug Products . . . . . . . . 15

VI.  FUTILITY OF PRE-FILING DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A.  Plaintiff Is Excused From Making A Demand Since Novartis' Board Knew
       About The Wrongdoing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    B.  The Director Defendants' Wrongful Acts Are Not Protected By The
       Business Judgment Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

VII.  CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    FIRST CAUSE OF ACTION
    BREACH OF FIDUCIARY DUTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    SECOND CAUSE OF ACTION
    ABUSE OF CONTROL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    THIRD CAUSE OF ACTION
    UNJUST ENRICHMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

VIII.  PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

IX.  JURY TRIAL DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

1   Plaintiff, derivatively on behalf of Novartis AG (also known as Novartis, Inc.),

2   alleges the following based upon the investigation of plaintiff and counsel, including a

3   review of legal and regulatory filings, press releases, media reports, and publicly available

4   information about Novartis AG.

5   **I.    INTRODUCTION**

6   1.    This derivative action is brought pursuant to Federal Rule of Civil

7   Procedure 23.1 on behalf of nominal defendant Novartis AG ("Novartis" or "Company"),

8   a Swiss corporation doing business throughout the United States and in this District,

9   against certain present and former members of Novartis' Board of Directors ("Novartis

10  Board" or "Board") and certain senior executives for breaches of fiduciary duty.  This

11  action concerns the promotion of "off-label" uses of trileptal, an epilepsy seizure

12  medication, by Novartis Pharmaceuticals Corporation ("NPC"), a subsidiary of Novartis

13  headquartered in East Hanover, New Jersey, and potentially of TOBI, a drug used to treat

14  cystic fibrosis, by Chiron Corporation ("Chiron"), a business unit of Novartis

15  headquartered in Emeryville, California.

16  2.    Under the provisions of the Food, Drug and Cosmetic Act, a company must

17  specify the intended uses of a product in its new drug application to the Food and Drug

18  Administration ("FDA").  After approval, the drug may not be marketed or promoted for

19  off-label uses.  An off-label use is a use other than those mentioned on the drug's

20  approved label, which states the conditions for which the drug has been shown to be safe

21  and effective.  Off-label uses also include changing the approved dose or combining it

22  with other treatments.  The FDA prohibits pharmaceutical companies from marketing or

23  promoting off-label uses of their drugs without its formal approval.  Physicians are

24  permitted to prescribe drugs for off-label uses.  Problems that can arise from off-label use

25  include unforeseen effects because the drug was not studied in the off-label patient and

26  the appropriate dosage and treatment regimen have not been determined.

27  3.    The illegal promotion of off-label uses of trileptal and, potentially, of

28  TOBI, has resulted in incurred expenses, exposure to a federal government investigation,

1   and potentially millions of dollars in fines against the Company. In its Form 6-K
2   statement filed with the Securities and Exchange Commission ("SEC") on July 21, 2005,
3   Novartis disclosed that the U.S. Attorney's Office for the Eastern District of Pennsylvania
4   had commenced parallel civil and criminal investigations into the off-label promotion of
5   trileptal. See attached Exhibit A. In its 2007 Form 20-F filed with the SEC on January
6   28, 2008, Novartis disclosed that the investigation is ongoing. See attached Exhibit B.
7   As detailed herein, public documents indicate that Novartis, through Chiron, also
8   promoted the off-label use of TOBI.

9       4.      By engaging in this scheme, the defendants were able to conceal the fact
10   that the Company was receiving revenues from marketing and promoting off-label uses of
11   its products. Keeping the scheme secret also hid the injury to the Company in the form of
12   expenses, exposure to federal government investigations, and potentially millions of
13   dollars in fines against the Company.

14      5.      Chiron's illegal activities occurred both before and after the April 2006
15   merger between Novartis and Chiron ("Merger"). Novartis' Board and certain senior
16   executives were aware of Chiron's potential promotion of unapproved uses of TOBI both
17   before and after the Merger, yet did not stop the misconduct.

18      6.      NPC's illegal activities regarding trileptal occurred around the same time
19   period as the promotion of TOBI. Novartis' Board and certain senior executives were
20   aware of NPC's promotion of unapproved uses of trileptal prior to NPC's July 2005
21   announcement regarding the federal government's investigation, yet did not stop the
22   misconduct.

23      7.      Novartis' Board cannot be expected to do anything to pursue recovery of
24   funds that have been spent by, and should be reimbursed to, the Company. The Novartis
25   director defendants are unable to independently and disinterestedly consider a demand to
26   vigorously pursue this action on behalf of the Company because of their involvement in
27   the wrongdoing alleged herein.

28

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

**SHAREHOLDER DERIVATIVE COMPLAINT**

2

1   8.    There is no credible defense to the practice of promoting off-label uses of

2   Novartis products, nor serious dispute about the harm it can, and has caused, to the

3   Company.

4   9.    As alleged in detail herein, in gross breach of their fiduciary duties as

5   officers and/or directors of Novartis, defendants intentionally colluded with one another

6   to:

7       a.    improperly market and promote off-label uses of its products;

8       b.    conceal the off-label promotion of its products from shareholders

9           and appropriate regulatory agencies, including the FDA;

10      c.    cause Novartis to violate applicable laws, rules and regulations

11          regarding off-label promotion of its products; and

12      d.    financially benefit from their service as Novartis directors and/or

13          officers, even while breaching their fiduciary duties to the Company.

14  10.    As a result of the egregious misconduct by defendants, Novartis has

15  incurred expenses, and exposed itself to potentially millions of dollars in fines and/or

16  penalties, damage to its reputation and loss of goodwill for improperly promoting off-

17  label uses of its products.

18  11.    This action seeks recovery for all of these damages, since Novartis' Board

19  cannot be expected to and has failed to recover for the harm caused to the Company based

20  on the defendants' failure to ensure the Company's compliance with applicable laws and

21  regulations.

22  **II.    JURISDICTION AND VENUE**

23  12.    This Court has jurisdiction over this dispute pursuant to 28 U.S.C. §

24  1332(a)(2) in that plaintiffs and defendants are citizens of different states and the matter

25  in controversy exceeds \$75,000.00, exclusive of interest and costs. This Court also has

26  supplemental jurisdiction pursuant to 28 U.S.C. §1367. This action is not a collusive one

27  to confer jurisdiction on a court of the United States which it would not otherwise have.

28

LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

13.    Venue is proper in this District. Novartis, a Swiss corporation, is located in and conducts business in this District through its business unit Chiron, part of Novartis Vaccines and Pharmaceuticals. Many of the acts alleged herein, including the formulation and/or implementation of plans to promote uses of TOBI, occurred in this District.

## III.    INTRADISTRICT ASSIGNMENT

14.    As alleged herein, a substantial part of the events at issue occurred within the City and County of San Francisco, where Chiron trained its sales force to promote uses of TOBI. Accordingly, this action is properly assigned to the San Francisco Division of this Court.

## IV.    PARTIES

### A.    Plaintiff

15.    Plaintiff **Greg Sarandi, Trustee of Next Phase Marketing, Inc. Defined Benefit Plan and Trust** ("Sarandi") owns Novartis American Depositary Shares and has continuously held Novartis stock at all times relevant hereto. Plaintiff Sarandi is a resident of Arizona.

16.    U.S.-based shareholders of Novartis hold Novartis ADSs. Each ADS represents a registered ordinary share ("Share"), and a Share has a nominal value of 0.5 Swiss francs. Each Share is entitled to one vote at the shareholders' meeting.

17.    An ADS holder holds Shares pursuant to the Deposit Agreement, dated as of December 17, 1996, and amended as restated as of May 11, 2000, among the Company, Morgan Guaranty Trust Company of New York, as depositary, and the registered Holders from time to time of the American Depositary Receipts ("ADR") issued thereunder. The Deposit Agreement is governed by and shall be construed in accordance with the laws of New York.

18.    ADRs are American Depositary Receipts executed and delivered pursuant to the terms of the Deposit Agreement. An ADR is a physical certification or Direct Registration that evidences a certain number of ADSs. Only persons in whose names

1  ADRs are registered on the books of the Depositary will be treated by the Depositary and
2  the Company as Holders.

3      19.    Plaintiff brings this action derivatively on behalf of Novartis.

4      **B.    Defendants**

5      20.    Nominal Defendant **Novartis AG** is a Swiss stock corporation with its
6  principal executive offices at Lichtstrasse 35, 4056 Basel, Switzerland. Novartis was
7  formed in 1996 when Ciba-Geigy Ltd. merged with Sandoz Ltd. Novartis designs,
8  develops, manufactures, and markets health care products. At the time of the events
9  alleged in this complaint, Novartis had American Depositary Shares ("ADS") registered
10  with the SEC and listed on the New York Stock Exchange under the ticker symbol
11  "NVS." As a registered foreign company, Novartis is required to file certain disclosure
12  statements with the SEC, including Forms 20-F (the equivalent of Form 10-K annual
13  report for domestic companies) and 6-K (the equivalent of Form 8-K periodic report for
14  domestic companies) relating to financial information and current events, respectively. In
15  2007, Novartis had net sales of $38 billion with net income of $6.5 billion.

16      21.    From January 1995 until April 2006, Novartis owned at least 40% of
17  Chiron's publicly held shares. In April 2006, Novartis completed its acquisition of the
18  remaining 56% of the outstanding publicly held common shares of Chiron that it did not
19  already own for $48 per share, or approximately $5.3 billion. Chiron merged into
20  Novartis and became a part of the Novartis group of companies. The newly formed
21  Novartis Vaccines and Diagnostics is comprised of two units – Novartis Vaccines and
22  Chiron, the Diagnostic business. Chiron's pharmaceutical operations were integrated into
23  Novartis' Pharmaceuticals Division.

24      22.    Founded in 1981, Chiron was based in Emeryville, California, and had
25  more than fifty (50) products to detect, prevent, and treat disease worldwide. In 2005,
26  Chiron had revenues of $1.9 billion.

27

28

⊛
LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**SHAREHOLDER DERIVATIVE COMPLAINT**

5

1     23.     NPC, the Novartis Pharmaceuticals Division's U.S. subsidiary, is based in
2 East Hanover, New Jersey. NPC's products treat a wide range of diseases, including
3 cardiovascular, respiratory, and neurological conditions.

4     24.     Defendant **Raymund Breu** ("Breu") began serving as a director of Chiron
5 in 1999. Pursuant to the Governance Agreement between Novartis and Chiron, which is
6 described in further detail herein, Novartis appointed Breu as one of its three designated
7 directors to Chiron's Board of Directors. Since 1996, he has been the Chief Financial
8 Officer of Novartis and a Member of Novartis' Executive Committee. From 2005 to
9 2007, Breu received at least **$11.25 million** from Novartis in compensation, shares, and
10 share options based on Novartis' performance. Novartis paid for expenses related to
11 Breu's service on Chiron's Board. As of December 31, 2004, he was a member of the
12 Compensation Committee and the Nominating and Corporate Governance Committee of
13 Chiron. On information and belief, Breu resides in Switzerland.

14     25.     Defendant **Birgit Breuel** ("Breuel") served as a director of Novartis from
15 1996 to 2007. In 1999, Breuel became a member of the Audit and Compliance
16 Committee. On information and belief, Breuel resides in Germany.

17     26.     Defendant **Peter Burckhardt** ("Burckhardt") has served as a director of
18 Novartis since 1996. Burckhardt became a member of the Audit and Compliance
19 Committee in 2007. From 1982 to 2004, Burckhardt was the Chairman of the Novartis
20 (formerly Sandoz) Foundation for Biomedical Research in Switzerland. Since 1982,
21 Burckhardt has been the Head of the Department of Internal Medicine at the University of
22 Hospital of Lausanne, Switzerland. On information and belief, Burckhardt resides in
23 Switzerland.

24     27.     Defendant **Srikant Datar** ("Datar") has served as a director of Novartis
25 since 2003. Datar became a member of the Audit and Compliance Committee in 2007.
26 The Board has appointed him as Audit Committee Financial Expert. Datar is a professor
27 and senior associate dean at Harvard Business School. On information and belief, Datar
28 resides in Massachusetts.

**SHAREHOLDER DERIVATIVE COMPLAINT**

6

1      28.    Defendant **William W. George** ("George") has served as a director of

2 Novartis since 1996. In 2000, George became a member of the Chairman's Committee

3 and Chairman of the Corporate Governance and Nomination Committee. He is also a

4 member of the Compensation Committee. George was CEO of Medtronic, Inc., a

5 medical devices company, from 1991 to 2001, and Chairman of the Medtronic Board of

6 Directors from 1996 to 2002. George is currently a professor at Harvard Business

7 School. On information and belief, George resides in Massachusetts.

8      29.    Defendant **Alexandre F. Jetzer** ("Jetzer") has served as a director of

9 Novartis since 1999. From 1996 to 1999, Jetzer served as a member of the Novartis

10 Executive Committee and Head of International Coordination, Legal & Taxes. Jetzer

11 holds a law degree and is a licensed attorney. Jetzer has a consultancy agreement with

12 Novartis (Government Relations Support). On information and belief, Jetzer resides in

13 Switzerland.

14      30.    Defendant **Pierre Landolt** ("Landolt") has served as a director of Novartis

15 since 1996. He has been a member of the Corporate Governance and Nomination

16 Committee since 2006. Landolt is a co-founder of EcoCarbone, LLC, a company focused

17 on carbon sequestrian processes. On information and belief, Landolt resides in France.

18      31.    Defendant **Ulrich Lehner** ("Lehner") has served as a director of Novartis

19 since 2002. He is currently Vice Chairman and Lead Director as well as Chairman of the

20 Audit and Compliance Committee. He is also a member of the Chairman's Committee,

21 the Compensation Committee, and the Corporate Governance and Nomination

22 Committee. The Board has appointed him as Audit Committee Financial Expert. Lehner

23 is the President and CEO of Henkel KGaA. On information and belief, Lehner resides in

24 Germany.

25      32.    Defendant **Hans-Joerg Rudloff** ("Rudloff") has served as a director of

26 Novartis since 1996. He is the currently the Vice Chairman of the Board and Chairman

27 of the Compensation Committee. In 1999, Rudloff became a member of the Chairman's

28 Committee and the Compensation Committee. He has been a member of the Corporate

1   Governance and Nomination Committee. Since 2004, Rudloff has been a member of the

2   Audit and Compliance Committee. The Board has appointed him as Audit Committee

3   Financial Expert. Rudloff is Chairman of Barclays Capital. On information and belief,

4   Rudloff resides in the United Kingdom.

5   33.   Defendant **Helmut Sihler** ("Sihler") served as a director of Novartis from

6   1996 to 2006. He became Vice Chairman of the Board in 1996. In 1999, Sihler was

7   appointed Lead Director, whose responsibilities include supervising the evaluation of the

8   Chairman and CEO, and chairing the meetings of the non-executive directors. He served

9   on the Chairman's Committee and the Corporate Governance and Nomination

10   Committee. Sihler also served as Chairman of the Compensation Committee, which

11   determines the compensation of non-executive directors. Sihler's knowledge of financial

12   matters and applicable regulations qualified him to serve as Chairman of the Audit and

13   Compliance Committee, which is responsible for ensuring the Company's compliance

14   with laws and regulations. He also holds a law degree. Sihler was previously the

15   Chairman of the Supervisory Board of Dr. Ing. h.c. F. Porsche AG. Sihler retired from

16   the Novartis Board in 2006. On information and belief, Sihler resides in Germany.

17   34.   Defendant **Daniel Vasella** ("Vasella") has served as the Chief Executive

18   Officer of Novartis and member of the Novartis Board since 1996. Since 1999, Vasella

19   has been Chairman of the Board. He is also a member of the Novartis Executive

20   Committee, a body consisting of Novartis' senior management charged with overseeing

21   Novartis' business operations. On information and belief, Vasella resides in Switzerland.

22   35.   Defendant **Wendelin Wiedeking** ("Wiedeking") has served as a director of

23   Novartis since 2003. He is the CEO and Chairman of Dr. Ing. h.c. F. Porsche AG. On

24   information and belief, Wiedeking resides in Germany.

25   36.   Defendant **Rolf M. Zinkernagel** ("Zinkernagel") has served as a director of

26   Novartis since 1999. He has been a member of the Corporate Governance and

27   Nomination Committee since 2001. Since 1992, he has been a professor and Director for

28   the Institute of Experimental Immunology at the University of Zurich, Switzerland. The

1  Board has appointed Zinkernagel to the Scientific Advisory Board of the Novartis

2  Institute for Tropical Diseases and to the Board of Directors of the Genomics Institute of

3  the Novartis Research Foundation. On information and belief, Zinkernagel resides in

4  Switzerland.

5       37.    By reason of their corporate positions and their ability to control Novartis'

6  business and affairs, defendants owed Novartis fiduciary obligations of due care and good

7  faith, and were required to use their utmost ability to control Novartis in a fair, just and

8  equitable manner, as well as to act in furtherance of the best interests of Novartis and not

9  in furtherance of their own personal interests or contrary to law. In addition, each

10  director owed Novartis, while he or she occupied a position on the Novartis Board, the

11  fiduciary duty to exercise good faith, due care and diligence in the management and

12  administration of the affairs of Novartis, including taking all necessary steps to cause

13  Novartis to comply with applicable laws and regulations. In violation of their fiduciary

14  duties of care and good faith, defendants caused Novartis, NPC, and/or Chiron to conduct

15  their business in an imprudent and illegal manner by pursuing the unlawful business

16  practices detailed in this Complaint.

17       38.    Defendants, in breach of their duty of good faith, consciously permitted or

18  failed to prevent Novartis, NPC, and/or Chiron from violating laws regulating

19  pharmaceutical products in the United States.

20      **C.**    **Unnamed Participants**

21       39.    Numerous individuals and entities participated during the course of and in

22  furtherance of the wrongdoing described herein. The individuals and entities acted in

23  concert through joint ventures and by acting as agents for principals, in order to advance

24  the objectives of the scheme to the detriment of Novartis.

25       40.    David A. Happel ("Happel") was the Vice President of Pulmonology at

26  Chiron from 2002 until about December 2006. In this position, Happel led the successful

27  pulmonary business unit, including the sales and marketing of TOBI. Happel also

28  supervised the effort to promote off-label uses of TOBI. Prior to that, he managed

1    Chiron's infectious and respiratory disease product portfolio. Happel resides in
2    California.

3         41.    Pierre E. Douaze ("Douaze") began serving as a director of Chiron in 1995.
4    Pursuant to the Governance Agreement between Novartis and Chiron, Novartis appointed
5    Douaze as one of its three designated directors to Chiron's Board of Directors. Upon the
6    formation of Novartis in 1996, Douaze became a member of the Executive Committee of
7    Novartis and Head of its Healthcare Division and Pharma Sector. In December 1997,
8    Douaze retired from Novartis. As of December 31, 2004, he was a member of the Audit
9    Committee and Nominating and Corporate Governance Committee of Chiron. Among
10   other things, the Audit Committee is charged with assuring compliance with applicable
11   laws and regulations. On information and belief, Douaze resides in Switzerland.

12        42.    Paul L. Herrling ("Herrling") began serving as a director of Chiron in 1997.
13   Pursuant to the Governance Agreement between Novartis and Chiron, Novartis appointed
14   Herrling as one of its three designated directors to Chiron's Board of Directors. In 2003,
15   Herrling became the Head of Corporate Research at Novartis. Prior to that, Herrling was
16   the Head of Research at Novartis Pharma AG and a member of the Novartis Pharma
17   Executive Board. Novartis paid for expenses related to Herrling's service on Chiron's
18   Board. On information and belief, Herrling resides in Switzerland.

19        43.    Andreas von Planta ("von Planta") began serving as a director of Novartis
20   in 2006. He became a member of the Audit and Compliance Committee in 2006. von
21   Planta holds a law degree and practices in the areas of corporate law and mergers and
22   acquisitions. On information and belief, von Planta resides in Switzerland.

23        **D.    Agency and Aiding and Abetting**

24        44.    The defendants, and each of them, are sued as participants and as aiders and
25   abettors herein alleged. At all times herein mentioned, each of the defendants was the
26   agent, servant, partner, aider and abettor, co-conspirator, and/or joint venturer of each of
27   the remaining defendants herein. They were at all times operating and acting within the
28   purpose and scope of said agency, service, employment, partnership, conspiracy, and/or

LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**SHAREHOLDER DERIVATIVE COMPLAINT**

10

1    joint venture and rendered substantial assistance and encouragement to the other

2    defendants, knowing that their conduct constituted a breach of duty.

3    **E.    Doe Allegations**

4    45.    Except as described herein, plaintiff is ignorant of the true names of

5    defendants sued as Does 1 through 50, inclusive, and, therefore, plaintiff sues these

6    defendants by such fictitious names. Following further investigation and discovery,

7    plaintiff will seek leave of this Court to amend this Complaint to allege their true names

8    and capacities when ascertained. These fictitiously named defendants may be the

9    Company's officers, other members of management, employees and/or consultants who

10    were involved in the wrongdoing detailed herein. These defendants aided and abetted,

11    and participated with and/or conspired with the named defendants in the wrongful acts

12    and course of conduct or otherwise caused the damages and injuries claimed herein and

13    are responsible in some manner for the acts, occurrences and events alleged in this

14    Complaint.

15    **V.    FACTUAL ALLEGATIONS**

16    **A.    The Close Relationship Between Novartis and Chiron**

17    46.    From 1995 until the 2006 Merger, Novartis had a substantial financial

18    interest in Chiron. The relationship between Novartis and Chiron was intimate enough

19    that Chiron reported agreements and transactions with Novartis under "Note 9–Related

20    Party Transactions" in its Form 10-K filings.

21    47.    Under a series of agreements between Chiron and Novartis, Novartis'

22    ownership interest in Chiron was 49.9% in January 1995. As a result of subsequent stock

23    issuances by Chiron, Novartis' ownership interest was approximately 42.2% as of

24    December 31, 2002, and 43.9% as of December 31, 2005.

25    48.    In 1995, Novartis and Chiron entered into the Governance Agreement,

26    under which Novartis agreed not to increase its ownership stake in Chiron above 55%

27    unless its acquired all of Chiron's outstanding capital stock in a "buy-out transaction." A

28    buy-out transaction involves the purchase of a company's stock in exchange for a certain

1  amount of cash per share, rather than the exchange of the acquiring company's stock for

2  the acquired company's stock. The Merger was a buy-out transaction, with Novartis

3  paying $48 for each Chiron share, or a total of $5.3 billion.

4  49.  The Governance Agreement provided that as long as Novartis held at least

5  40% of Chiron's outstanding common stock, Chiron could not enter into certain

6  transactions without Novartis' approval, including significant debt or equity issuances or

7  purchases, most mergers and acquisitions, amendments to Chiron's Certificate of

8  Incorporation or By-laws, and other transactions that would adversely affect the rights of

9  Novartis, or discriminate against Novartis, as a Chiron shareholder.

10  50.  The Governance Agreement further gave Novartis the right to nominate

11  **three** of Chiron's ten member Board of Directors. The directors designated by Novartis

12  were "investor directors." A majority of the investor directors on Chiron's Board were

13  required to approve certain other corporate transactions, including the issuance of equity

14  securities, other than common stock or the option to purchase common stock, to any

15  Chiron employee, amendments to Chiron's bylaws, and the payment of certain kinds of

16  consideration in connection with an acquisition.

17  51.  Under the Governance Agreement, the Nominating and Corporate

18  Governance Committee of Chiron was responsible for recommending director nominees,

19  subject to Novartis' right to designate three investor directors. As long as Novartis'

20  ownership interest in Chiron was at least 40%, then the Nominating and Corporate

21  Governance Committee would consist of three independent directors and two investor

22  directors. The Nominating and Corporate Governance Committee could not nominate a

23  director who was opposed by both of the investor directors. This provision allowed

24  Novartis to block the nomination of any individual who might be unfriendly or adverse to

25  Novartis' interests.

26  52.  At the time of the Merger, the three investor directors were Breu, Douaze,

27  and Herrling. All three had close and long-standing ties to Novartis and were Chiron

28  directors since at least 1999, prior to the time Chiron began its marketing of TOBI. As

LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**SHAREHOLDER DERIVATIVE COMPLAINT**

12

1   directors designated by Novartis, the investor directors acted as a conduit of information

2   between the Chiron and Novartis Boards regarding Chiron's business practices, including

3   its promotion of TOBI.

4       53.   Douaze and Breu played important roles with respect to Chiron's Audit

5   Committee, which, among other things, was charged with assuring compliance with

6   applicable laws and regulations. Douaze was a member of the Audit Committee.

7   Regarding Breu's role, Chiron's Schedule 14A proxy statement, filed with the SEC on

8   April 7, 2005, stated:

9       Members of Chiron's board are <u>invited</u> to attend and participate in meetings
        of the Audit Committee in order to allow the Audit Committee to take
10      advantage of the expertise afforded by the Board's members, <u>including Dr.
        Breu</u>, who serves as Chief Financial Officer of Novartis... During 2004, the
11      Audit Committee met eight times. (emphasis added)

12      54.   The Investment Agreement between Novartis and Chiron provided that

13   Novartis would guarantee certain Chiron obligations under revolving credit facilities

14   through January 1, 2008, the date on which the guarantee expired. The principal amount

15   of indebtedness under the guaranteed credit facilities could not exceed $402.5 million.

16   As of December 31, 2004, Novartis had guaranteed $100 million under a U.S. credit

17   facility for Chiron's benefit for which there were no borrowings outstanding and $173.3

18   million of Chiron's operating lease commitments.

19      55.   Novartis and Chiron also entered into numerous research and development

20   and financial agreements, including the Cooperation and Collaboration Agreement, the

21   Market Price Option Agreement, and the Subscription Agreement.

22      56.   Through these agreements, in particular the Governance and Investment

23   Agreements, Novartis exerted substantial control over Chiron since the inception of the

24   relationship in 1995. Long before the Merger, Novartis took an active role in controlling

25   and monitoring Chiron's financial and business affairs.

26      **B.    The Approved Use Of TOBI To Treat Cystic Fibrosis**

27      57.   Cystic fibrosis is an inherited chronic disease which affects the lungs and

28   digestive systems. The disease causes the body to produce a thick mucus that can clog

1  airways and result in chronic lung infections. In the 1950s, few children with cystic
2  fibrosis lived beyond the age of five, but today because of advances in treatment, people
3  diagnosed with cystic fibrosis may live into their 30s, 40s or even longer. Approximately
4  30,000 people suffer from cystic fibrosis. About 1,000 new cases are diagnosed every
5  year.

6      58.    There is no known cure for cystic fibrosis, but new therapies have become
7  increasingly effective in treating the disease. Numerous companies have been involved in
8  the research and development of treating cystic fibrosis, including gene therapy, protein
9  assistance and repair, restoring salt to the cell surface, mucus treatment, anti-
10  inflammatory drugs, anti-infection drugs, lung transplant drugs and nutritional
11  supplements to help improve the body's ability to ward off the effects of cystic fibrosis.
12  These therapies have prolonged and improved thousands of people's lives, but the search
13  continues for better and more innovative therapies to stop this horrible disease.

14      59.    In December 1997, the FDA approved the drug-device combination
15  TOBI™ (tobramycin solution for inhalation). TOBI is a particular concentration of
16  tobramycin solution for inhalation in the Pari LC Plus nebulizer (a delivery device). The
17  FDA's approval allowed PathoGenesis Corporation, which then owned the rights to
18  TOBI, to market and make representations about the safety and efficacy of TOBI as a
19  treatment only for cystic fibrosis-related lung functions, and only in a concentration of 60
20  mg/ml to be used in conjunction with the Pari LC Plus nebulizer.

21      60.    In September 2000, Chiron acquired PathoGenesis Corporation, thereby
22  acquiring the rights to market TOBI pursuant to the FDA approved use. TOBI has been
23  successful in decreasing the effects of cystic fibrosis, improving lung function and
24  reducing the number and duration of hospital stays. Because the bacteria that causes
25  infections in patients can develop a resistance to TOBI, it is used on a 28-day cycle
26  followed by a 28-day cycle off the drug.

27      61.    In its 2002 Form 10-K, filed with the SEC on March 5, 2003, Chiron
28  discussed increasing competitive pressures on the sales of TOBI. Competitive therapies

LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**SHAREHOLDER DERIVATIVE COMPLAINT**

14

1    include generic antibiotics, anti-inflammatory drugs, oral replacement enzymes to

2    maintain nutrition, and drugs to clear pulmonary secretions.  Chiron's U.S. patent for

3    TOBI expires in 2014, and the European patent expires in 2015.

4    62.    In its 2005 Form 10-K filed with the SEC on March 13, 2006, Chiron stated

5    the **only** FDA-approved use of TOBI:

6    TOBI solution has been tested and approved for cystic fibrosis patients with
     *Pseudomonas aeruginosa* lung infections and is the first and only inhaled
7    antibiotic solution to be approved by the FDA for cystic fibrosis.

8    63.    TOBI has been one of Chiron's top selling-drugs, and its sales increased

9    dramatically in the years prior to the Merger as shown by the following table:

| YEAR | TOBI SALES ($ MILLIONS) | INCREASE OVER PRIOR YEAR |
|------|-------------------------|--------------------------|
| 2002 | 147 | -- |
| 2003 | 172 | 17% |
| 2004 | 213 | 23.7% |
| 2005 | 233 | 9.3% |

In 2005, TOBI accounted for **12%** of Chiron's $1.9 billion in sales.  As of 2005, Chiron

marketed TOBI in the United States, the European Union, Canada, Switzerland, Norway,

Israel, Argentina and Brazil.

   **C.    Defendants' Promotion of Off-Label Uses of Drug Products**

64.    Both before and after the Merger, Chiron actively promoted TOBI,

including, potentially, for off-label uses.  As a result, sales of TOBI increased

dramatically during 2003, 2004 and 2005, as described above.

65.    Happel managed the effort to promote uses of TOBI in his capacity as

Director of TOBI Global Marketing beginning in late 2002.  He was also Vice President

of Pulmonology at Chiron until late 2006.

66.    Chiron held its annual North American Sales Meeting from <u>February 10-14,
2003</u> at the **Grand Hyatt Hotel in San Francisco**.  This was one of the earliest instances

of Chiron training its U.S. TOBI sales force to promote various uses of TOBI.  Senior

28

1    executives, including Sean P. Lance (then President, CEO, and Chairman of the Board of

2    Chiron) and Craig A. Wheeler (then Vice President of Chiron, and President of Chiron

3    Biopharmaceuticals), gave overview presentations about Chiron. The marketing group

4    presented programs and activities for the year. Specific marketing programs and sales

5    operations for TOBI were discussed. Regional sales teams broke out into groups to

6    discuss sales tactics and goals for TOBI.

7         67.    The training provided at this meeting occurred contemporaneously with the

8    completion and implementation of the TOBI Global Life Cycle Plan ("Life Cycle Plan").

9    The TOBI Global Marketing Team developed the Life Cycle Plan to comprehensively

10   manage the TOBI franchise to maximize TOBI's revenues, while addressing the

11   challenges of competitive drugs and devices and those created by a maturing product. As

12   part of the implementation of the Life Cycle Plan, numerous project teams were formed to

13   develop strategies and tactics to deal with key issues and opportunities. One key issue

14   was finding ways to maximize TOBI sales. Country Product Managers, Country General

15   Managers, Infectious Disease Therapeutic Area Teams and senior managers at Chiron

16   Biopharmaceuticals all reviewed and endorsed the Life Cycle Plan.

17        68.    Publicly available documents and postings indicate that Chiron engaged in

18   off-label promotion practices regarding TOBI. A March 2005 response to a question

19   about a position in Chiron's Pulmonology division, posted on one pharmaceutical

20   website, warned:

21        Here are some of the overall problems at Chiron: Call reporting, marketing calling
          all the shots and taking the role of sales leadership... **forcing us to sell off-label**
22        **(which puts us at risk of being fined by FDA)**....need I say more? (parenthetical
          in original; emphasis added)
23
          69.    Soon thereafter, a June 2005 posting on the same website expressed concern
24
     about Chiron's practice of having sales representatives "educate" pulmonologists:
25
          I have decided that I cannot do this anymore. **Upper management has no**
26        **problems sending us in to see Pulmonologists to "educate" them on**
          **aerosolized antibiotics and disease state**. Does a physician really need me to
27        educate them? I seriously doubt it . . . . Will Chiron have my back if the shit hits
          the fan – no way in hell. I would be hung out to dry. So like I said before, I will
28        not put myself in jeopardy anymore. **DH, HK, JS – if you want off label sales**

**SHAREHOLDER DERIVATIVE COMPLAINT**

1   **and "education", go out and do it yourself.** You will all look cute in your orange jump suits. (emphasis added)

2

3   "DH" apparently refers to Happel, the VP of Pulmunology at Chiron at the time. The references to "HK" and "JS" are unclear.

4

5   70.     Further, an exchange from June 2005 mentioned some of the specific off-label uses for which Chiron may have promoted TOBI:

6

7   Question:     What could you possibly promote off label with TOBI????

8   Response:     **Idiot, we promoted for VAP.** Ask upper management why they had us stop. **We are still promoting for BE.** Trust me, it will only be a matter of time before they pull the plug on that one too.

9   (emphasis added)

10  "VAP" apparently refers to ventilator-associated pneumonia, which is the most common

11  infection contracted by intensive care unit patients. VAP results from infection which

12  floods the small, air-filled sacs in the lung that absorb oxygen. The condition occurs in

13  people who are on mechanical ventilation for at least forty-eight (48) hours. The

14  reference to "BE" is unclear.

15      71.     Chiron knew the legal and business risks of the off-label promotion of its

16  drug products. In its 2005 Form 10-K filing, Chiron acknowledged: "FDA law and

17  regulations **prohibit** the marketing and promotion of ... **unapproved uses** of drug and

18  device products." (emphasis added) Chiron also stated:

19      If we market products in a manner that violates state, federal or foreign laws that govern pharmaceuticals and health care products, including FDA,

20      FTC, and health care fraud and abuse laws, we may be subject to **civil or criminal penalties**, including the potential for exclusion from federal, state

21      and foreign programs." *Id.* (emphasis added)

22  Moreover, Chiron knew that other pharmaceutical companies had been investigated and

23  fined for **"engaging in 'off-label' promotion that caused claims to be submitted to**

24  **federal and state programs for non-covered off-label uses."** *Id.* (emphasis added)

25      72.     For example, following a Department of Justice investigation, in 2004,

26  Warner-Lambert pled guilty and agreed to pay more than $430 million to resolve criminal

27  charges and civil liabilities in connection with its Parke-Davis division's illegal and

28  fraudulent promotion of off-label uses for its epilepsy drug, Neurontin. Contrary to its

1  FDA-approved use, Warner-Lambert actively marketed Neurontin to treat bipolar
2  disorder, Amyotrophic Lateral Sclerosis, and attention deficit disorder, among others.
3  Warner-Lambert used several tactics in its off-label promotion of Neurontin, including,
4  but not limited to: (1) encouraging its sales representatives to provide one-on-one sales
5  pitches to physicians about off-label uses of Neurontin without any inquiry by physicians;
6  (2) paying physicians to attend "consultants meetings" where physicians received a fee
7  for attending dinners or conferences where presentations regarding off-label uses of
8  Neurontin were given; and (3) misleading the medical community about the content and
9  lack of independence from the company's influence over many educational events where
10  off-label uses of Neurontin were discussed.

11  73.  In 2005, Eli Lilly agreed to plead guilty and to pay $36 million relating to
12  its illegal promotion of its drug Evista. Although Evista is approved by the FDA for the
13  prevention of osteoporosis in post-menopausal women, Eli Lilly misbranded Evista by
14  promoting it for the prevention and reduction of risk of breast cancer and cardiovascular
15  disease. However, the FDA had specifically rejected Eli Lilly's proposed labeling for
16  breast cancer. Eli Lilly used several tactics in its off-label promotion of Evista, including,
17  but not limited to: (1) encouraging its sales representatives to provide one-on-one sales
18  pitches to physicians about off-label uses of Evista; (2) encouraging its sales
19  representatives to send unsolicited letters to physicians about off-label uses of Evista; and
20  (3) organizing a "market research summit" during which Evista was discussed with
21  physicians for reducing the risk of breast cancer.

22  74.  Despite knowing about the illegality and financial risks of off-label
23  promotion, public postings indicate that Chiron may have encouraged and trained its
24  TOBI sales force to use some of these same tactics to promote off-label uses of TOBI.

25  75.  For most or all of the time that Chiron appears to have promoted off-label
26  uses of TOBI, Novartis' Board failed to take action to stop any off-label promotion.
27  Indeed, during much of this same period of time, Novartis' Board was facing similar
28  allegations regarding the off-label promotion of another drug product, trileptal.

76.     In 2000, the FDA approved trileptal for the treatment of partial seizures as monotherapy in adults or adjunctive therapy (use in combination with other anticonsulvant drugs) in adults and children as young as 4 years.  Since then, the FDA has approved the use of trileptal as monotherapy in children (in 2003) and as adjunctive therapy for partial seizures in epileptic children aged 2 to 4 years (in 2005).

77.     Trileptal was one of Novartis' top selling pharmaceuticals worldwide.  In the U.S. alone, sales of trileptal were $305 million in 2003; $391 million in 2004; $462 million in 2005; $549 million in 2006; and $500 million in 2007.

78.     However, on May 26, 2005, the U.S. Attorney's Office for the Eastern District of Pennsylvania served an administrative subpoena on NPC regarding the potential off-label promotion of trileptal.  To this day, the U.S. Attorney's Office is conducting parallel civil and criminal investigations into off-label promotion of trileptal. In its 2007 Form 20-F filed with the SEC on January 28, 2008, Novartis disclosed that the investigation is ongoing.  As of the filing of this Complaint, Novartis has not filed a Form 6-K or issued a public statement announcing that the investigation has ended or identifying the off-label uses subject to investigation.  However, a public posting from February 2008 reveals one possible off-label use, alleging that NPC promoted trileptal off-label to psychiatrists for the treatment of bipolar disorder.

79.     For most or all of the time that NPC promoted off-label uses of trileptal, Novartis' Board was aware of NPC's actions but failed to take action to stop the off-label promotion.  Prior to the announcement of the DOJ's investigation, and possibly thereafter, Novartis benefitted from the increase in trileptal sales due to the off-label promotion.

## VI.     FUTILITY OF PRE-FILING DEMAND

### A.     Plaintiff Is Excused From Making A Demand Since Novartis' Board Knew About The Wrongdoing

80.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the defendants' breaches of fiduciary duties, corporate mismanagement, abuse of control, as well as the aiding and abetting thereof.

LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

1    81.    Plaintiff is currently an owner of Novartis stock, has continuously held
2  Novartis stock at all times relevant hereto, and has standing to bring this derivative action.

3    82.    Plaintiff will adequately and fairly represent the interests of the Company
4  and its shareholders in enforcing and prosecuting its rights.

5    83.    The Swiss Code of Obligations requires directors and members of senior
6  management of Swiss corporations to safeguard the interests of the corporation and
7  imposes a duty of care and a duty of loyalty on such persons.  Swiss law permits
8  shareholders to bring a derivative action on behalf of the Company.

9    84.    As a result of the facts set forth herein, plaintiff has not made any demand
10  on the Novartis Board to institute this action against the defendants.  Such demand is
11  excused because making a demand would be a futile and useless act.  The Novartis Board
12  is incapable of making an independent and disinterested decision to institute and
13  vigorously prosecute this action, and the wrongful conduct alleged herein is not subject to
14  protection under the business judgment rule.

15    85.    The Novartis Board cannot make an independent and disinterested decision
16  because of Novartis' close relationship with Chiron.  Novartis dominated its relationship
17  with Chiron from 1995 until the Merger and thereafter.  Chiron could not undertake major
18  business or financial transactions without Novartis' consent.

19    86.    Nor can the Board make an independent and disinterested decision because
20  NPC is a subsidiary of Novartis.

21    87.    In addition, because the composition of Novartis' Board has remained
22  largely the same during the time that NPC promoted the off-label use of trileptal and that
23  Chiron potentially promoted the off-label use of TOBI, the Board cannot objectively
24  evaluate a demand to institute an action against the defendants – most of whom are
25  current or former Board members.

26    88.    The current Novartis Board members are Burckhardt, Datar, Ann Fudge
27  ("Fudge"), George, Jetzer, Landolt, Lehner, Rudloff, Vasella, von Planta, Wiedeking,
28  Marjorie M. Yang ("Yang"), and Zinkernagel.  The majority of Novartis' current

❀
LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**SHAREHOLDER DERIVATIVE COMPLAINT**

20

1    directors were also directors during the time that NPC promoted the off-label use of
2    trileptal and that Chiron potentially promoted the off-label use of TOBI. The only
3    exceptions are Fudge, elected to the Board in February 2008; von Planta, elected to the
4    Board in February 2006; and Yang, elected to the Board in 2007, with her term of service
5    beginning in January 2008.

6        89.    The following table summarizes the times of service and the committee
7    appointments of the current Novartis Board members as well as defendants who
8    previously served on the Board during the time that NPC promoted the off-label use of
9    trileptal and that Chiron potentially promoted the off-label use of TOBI (Breuel and
10   Sihler) (an "X" indicates that the Board member at one time served on the committee or
11   held the position):

12   ///

13   ///

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

| Board Member | Time of Service | Audit/ Compl. Comm. | Audit Comm. Expert | Corp. Gov./ Nom. Comm. | Comp. Comm. | Board Chair | Chair's Comm. | Vice Chair | Lead Dir. |
|---|---|---|---|---|---|---|---|---|---|
| **Breuel** | 1996-2007 | X | | | | | | | |
| **Burckhardt** | 1996-present | X | | | | | | | |
| **Datar** | 2003-present | X | X | | | | | | |
| **George** | 1996-present | | | X | X | | X | | |
| **Jetzer** | 1999-present | | | | | | | | |
| **Landolt** | 1996-present | | | X | | | | | |
| **Lehner** | 2002-present | X | X | X | X | | X | X | X |
| **Rudloff** | 1996-present | X | X | X | X | | X | | |
| **Sihler** | 1996-2006 | | X | X | | | X | X | X |
| **Vasella** | 1996-present | | | | | X | | | |
| **Wiedeking** | 1999-present | | | | | | | | |
| **Zinkernagel** | 1999-present | | | X | | | | | |
| **Fudge\*** | began in 2008 | | | | | | | | |
| **von Planta\*** | 2006-present | | X | | | | | | |
| **Yang\*** | began in 2008 | | | | | | | | |

\* Not named as a defendant



LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

**SHAREHOLDER DERIVATIVE COMPLAINT**

90.  All of the Novartis Board members named as defendants are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action.

a.  Defendant Vasella is incapable of considering a demand because:

   i.  he was the CEO and Chairman of the Novartis Board during the time that NPC promoted the off-label use of trileptal and that Chiron potentially promoted the off-label use of TOBI;

   ii.  he is directly interested since his compensation as CEO and Chairman is based on Novartis' performance. From 2005 to 2007, Vasella received approximately **$44 million** in compensation, shares, and share options based on Novartis' performance;

   iii.  he maintains personal and professional relationships with other members of the Board that create a reasonable doubt as to Vasella's ability to independently and disinterestedly consider a demand on the Board to pursue the relief sought herein. Moreover, Vasella and Breu serve together on the Novartis Executive Committee;

   iv.  he is a defendant in this action and there is reasonable doubt that Vasella is incapable of independently considering a demand to pursue this action on behalf of the Company because Vasella himself faces a substantial likelihood of liability for his actions;

b.  Defendant Sihler is incapable of considering a demand because:

   i.  he was a Novartis Board member during the time that NPC promoted the off-label use of trileptal and that Chiron potentially promoted the off-label use of TOBI;

   ii.  he is directly interested since in 2005, Sihler received approximately **$720,000** in fees, shares and/or compensation for his service as a Novartis director. In addition, at the end of 2005 and 2006, he was the beneficial owner of **34,304** and **16,788** Novartis shares respectively;

   iii.  as a member and the Chairman of the Audit and Compliance Committee, which is charged with ensuring the Company's compliance with laws and regulations, he failed to stop the misconduct alleged herein;

   iv.  he has had personal and professional relationships with other members of the Board that create a reasonable doubt as to Sihler's ability to independently and disinterestedly consider a demand on the Board to pursue the relief sought herein. For example, both Sihler and Lehner have held senior positions at Dr. Ing. h.c. F. Porsche AG;

   v.  he is a defendant in this action and there is reasonable doubt that Sihler is incapable of independently considering a demand to pursue this action on behalf of the Company because Sihler himself faces a substantial likelihood of liability for his actions;

c.    Defendant Rudloff is incapable of considering a demand because:

    i.    he was a Novartis Board member during the time that NPC promoted the off-label use of trileptal and that Chiron potentially promoted the off-label use of TOBI;

    ii.    he is directly interested since from 2005 to 2007, Rudloff received approximately **$1,700,000** in fees, shares and/or compensation for his service as a Novartis director. In addition, at the end of 2005, 2006 and 2007, he was the beneficial owner of **109,791** Novartis shares each year. At the end of 2007, Rudloff held **24,750** Novartis share options;

    iii.    as a member and Chairman of the Audit and Compliance Committee, which is charged with ensuring the Company's compliance with laws and regulations, he failed to stop the misconduct alleged herein;

    iv.    he is a defendant in this action and there is reasonable doubt that Rudloff is incapable of independently considering a demand to pursue this action on behalf of the Company because Rudloff himself faces a substantial likelihood of liability for his actions;

d.    Defendant Breuel is incapable of considering a demand because:

    i.    she was a Novartis Board member during the time that NPC promoted the off-label use of trileptal and that Chiron potentially promoted the off-label use of TOBI;

    ii.    she is directly interested since during 2005 and 2006, Breuel received approximately **$690,000** in fees, shares, and/or compensation for her service as a Novartis director. In addition, at the end of 2005 and 2006, she was the beneficial owner of **5,000** Novartis shares each year;

    iii.    as a member of the Audit and Compliance Committee, which is charged with ensuring the Company's compliance with laws and regulations, she failed to stop the misconduct alleged herein;

    iv.    she is a defendant in this action and there is reasonable doubt that Breuel is incapable of independently considering a demand to pursue this action on behalf of the Company because Breuel herself faces a substantial likelihood of liability for her actions;

e.    Defendant Burckhardt is incapable of considering a demand because:

    i.    he was a Novartis Board member during the time that NPC promoted the off-label use of trileptal and that Chiron potentially promoted the off-label use of TOBI;

    ii.    he is directly interested since from 2005 to 2007, Burckhardt received approximately **$620,000** in fees, shares, and/or compensation for his service as a Novartis director. In addition, at the end of 2005, 2006 and 2007, he was the beneficial owner of **15,264**, **19,472**, and **19,052** Novartis shares respectively;

iii. as a member of the Audit and Compliance Committee, which is charged with ensuring the Company's compliance with laws and regulations, he failed to stop the misconduct alleged herein;

iv. he maintains personal and professional relationships with other members of the Board that create a reasonable doubt as to Burckhardt's ability to independently and disinterestedly consider a demand on the Board to pursue the relief sought herein. Moreover, from 1982 to 2004, Burckhardt was the Chairman of the Novartis (formerly Sandoz) Foundation for Biomedical Research in Switzerland;

v. he is a defendant in this action and there is reasonable doubt that Burckhardt is incapable of independently considering a demand to pursue this action on behalf of the Company because Burckhardt himself faces a substantial likelihood of liability for his actions;

f. Defendant Datar is incapable of considering a demand because:

i. he was Novartis Board member during the time that NPC promoted the off-label use of trileptal and that Chiron potentially promoted the off-label use of TOBI;

ii. he is directly interested since from 2005 to 2007, Datar received approximately **$975,000** in fees, shares, and/or compensation for his service as a Novartis director. In addition, at the end of 2005, 2006 and 2007, he was the beneficial owner of **7,272, 9,403**, and **11,952** Novartis shares respectively;

iii. as a member of the Audit and Compliance Committee, which is charged with ensuring the Company's compliance with laws and regulations, he failed to stop the misconduct alleged herein;

iv. he maintains professional and personal relationships with other members of the Board that create a reasonable doubt as to Datar's ability to independently and disinterestedly consider a demand on the Board to pursue the relief sought herein. In 2002, Novartis donated $5 million to Harvard Business School, to endow a professorship in the name of Novartis at the school. Datar is a professor and senior associate dean of research at Harvard Business School;

v. he is a defendant in this action and there is reasonable doubt that Datar is incapable of independently considering a demand to pursue this action on behalf of the Company because Datar himself faces a substantial likelihood of liability for his actions;

g. Defendant George is incapable of considering a demand because:

i. he was Novartis Board member during the time that NPC promoted the off-label use of trileptal and that Chiron potentially promoted the off-label use of TOBI;

ii. he is directly interested since from 2005 and 2007, George received approximately **$1,150,000** in fees, shares, and/or compensation for his service as a Novartis director. In addition, at the end of 2005,

2006 and 2007, he was the beneficial owner of **115,709**, **118,865**, and **125,000** Novartis shares respectively;

    iii.    he maintains professional and personal relationships with other members of the Board that create a reasonable doubt as to George's ability to independently and disinterestedly consider a demand on the Board to pursue the relief sought herein. For example, George and Datar are both faculty members at Harvard Business School;

    ii.    he is a defendant in this action and there is reasonable doubt that George is incapable of independently considering a demand to pursue this action on behalf of the Company because George himself faces a substantial likelihood of liability for his actions;

h.    Defendant Jetzer is incapable of considering a demand because:

    i.    he was a Novartis Board member during the time that NPC promoted the off-label use of trileptal and that Chiron potentially promoted the off-label use of TOBI;

    ii.    he is directly interested since from 2005 and 2007, Jezter received approximately **$600,000** in fees, shares, and/or compensation for his service as a Novartis director. In addition, at the end of 2005, 2006 and 2007, he was the beneficial owner of **60,621, 65,530,** and **75,335** Novartis shares respectively;

    iii.    he maintains personal and professional relationships with other members of the Board that create a reasonable doubt as to Jetzer's ability to independently and disinterestedly consider a demand on the Board to pursue the relief sought herein. Moreover, Jetzer provides consultancy services to Novartis for Governmental Relations Support, for which Novartis paid him approximately **$550,000** from 2005 to 2007;

    iv.    he is a defendant in this action and there is reasonable doubt that Jetzer is incapable of independently considering a demand to pursue this action on behalf of the Company because Jetzer himself faces a substantial likelihood of liability for his actions;

i.    Defendant Landolt is incapable of considering a demand because:

    i.    he was a Novartis Board member during the time that NPC promoted the off-label use of trileptal and that Chiron potentially promoted the off-label use of TOBI;

    ii.    he is directly interested since from 2005 and 2007, Landolt received approximately **$860,000** in fees, shares, and/or compensation for his service as a Novartis director. In addition, at the end of 2005, 2006 and 2007, he was the beneficial owner of **11,342, 15,760,** and **19,709** Novartis shares respectively. At the end of 2007, Landolt held **24,191** Novartis share options;

    iii.    he maintains personal relationships with other members of the Board that create a reasonable doubt as to Landolt's ability to independently

1   and disinterestedly consider a demand on the Board to pursue the
    relief sought herein;

2

    iv.   he is a defendant in this action and there is reasonable doubt that
3         Landolt is incapable of independently considering a demand to
          pursue this action on behalf of the Company because Landolt himself
4         faces a substantial likelihood of liability for his actions;

5   j.    Defendant Lehner is incapable of considering a demand because:

6         i.    he was a Novartis Board member during the time that NPC promoted
                the off-label use of trileptal and that Chiron potentially promoted the
7               off-label use of TOBI;

8         ii.   he is directly interested since from 2005 and 2007, Lehner received
                approximately **$1,800,000** in fees, shares, and/or compensation for
9               his service as a Novartis director. In addition, at the end of 2005,
                2006 and 2007, he was the beneficial owner of **11,385, 16,788**, and
10              **22,193** Novartis shares respectively;

11        iii.  as a member and the Chairman of the Audit and Compliance
                Committee, which is charged with ensuring the Company's
12              compliance with laws and regulations, he failed to stop the
                misconduct alleged herein;

13
          iv.   he maintains personal and professional relationships with other
14              members of the Board that create a reasonable doubt as to Lehner's
                ability to independently and disinterestedly consider a demand on the
15              Board to pursue the relief sought herein. Further, both Lehner and
                Sihler have held senior positions at Dr. Ing. h.c. F. Porsche AG;

16
          iv.   he is a defendant in this action and there is reasonable doubt that
17              Lehner is incapable of independently considering a demand to pursue
                this action on behalf of the Company because Lehner himself faces a
18              substantial likelihood of liability for his actions;

19  k.    Defendant Wiedeking is incapable of considering a demand because:

20        i.    he was a Novartis Board member during the time that NPC promoted
                the off-label use of trileptal and that Chiron potentially promoted the
21              off-label use of TOBI;

22        ii.   he is directly interested since from 2005 and 2007, Wiedeking
                received approximately **$780,000** in fees, shares, and/or
23              compensation for his service as a Novartis director. In addition, at
                the end of 2005, 2006 and 2007, he was the beneficial owner of
24              **11,798, 15,586**, and **19,118** Novartis shares respectively;

25        iii.  he maintains personal relationships with other members of the Board
                that create a reasonable doubt as to Wiedeking's ability to
26              independently and disinterestedly consider a demand on the Board to
                pursue the relief sought herein;

27
          iv.   he is a defendant in this action and there is reasonable doubt that
28              Wiedeking is incapable of independently considering a demand to

LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

1    pursue this action on behalf of the Company because Wiedeking
himself faces a substantial likelihood of liability for his actions;

2

3    l.    Defendant Zinkernagel is incapable of considering a demand because:

4         i.    he was a Novartis Board member during the time that NPC promoted
the off-label use of trileptal and that Chiron potentially promoted the
5              off-label use of TOBI;

6         ii.    he is directly interested since from 2005 and 2007, Zinkernagel
received approximately **$1,080,000** in fees, shares, and/or
7              compensation for his service as a Novartis director. In addition, at
the end of 2005, 2006 and 2007, he was the beneficial owner of
8              **18,622, 19,231**, and **22,800** Novartis shares respectively. At the end
of 2007, Zinkernagel held **23,597** Novartis share options;

9

10        iii.    he maintains personal and professional relationships with other
members of the Board that create a reasonable doubt as to
11             Zinkernagel's ability to independently and disinterestedly consider a
demand on the Board to pursue the relief sought herein. Moreover,
12             for 2005 and 2006, Zinkernagel received approximately **$375,000** for
serving as the Board's delegate to the scientific advisory boards of
13             the Genomics Institute of the Novartis Research Foundation and the
Novartis Institute for Tropical Diseases;

14        iv.    he is a defendant in this action and there is reasonable doubt that
Zinkernagel is incapable of independently considering a demand to
15             pursue this action on behalf of the Company because Zinkernagel
himself faces a substantial likelihood of liability for his actions;

16

17   m.    Director von Planta is incapable of considering a demand because:

18        i.    he is directly interested since in 2006 and 2007, von Planta received
approximately **$660,000** in fees, shares, and compensation for his
19             service as a Novartis director. In addition, at the end of 2006 and
2007, he was the beneficial owner of **2,178** and **104,238** Novartis
20             shares respectively;

21        ii.    as a member of the Audit and Compliance Committee, which is
charged with ensuring the Company's compliance with laws and
22             regulations, he failed to stop the misconduct alleged herein;

23        iii.    he maintains personal and professional relationships with other
members of the Board that create a reasonable doubt as to
Zinkernagel's ability to independently and disinterestedly consider a
24             demand on the Board to pursue the relief sought herein.

25   91.    Demanding that the Board investigate and act upon the wrongdoing alleged

26   herein would be futile since defendants knew about the wrongdoing alleged herein or

27   recklessly disregarded the wrongs complained of or benefitted from the compensation

28   received during the time the conduct took place or have interests adverse to performing a

1    fair, unbiased investigation. The defendant directors breached their fiduciary duties

2    during the relevant period. Novartis' Board had detailed access to the deliberations of

3    Chiron's Board and Chiron's business practices through the investor directors. Because

4    the Board was aware of the misconduct alleged herein, the Board can neither exercise

5    independent, objective judgment in deciding whether to bring this action, nor could it be

6    expected to vigorously prosecute this action.

7    92.    Defendants cannot be relied upon to reach an independent decision

8    regarding whether to commence an action against themselves because, among other

9    things, the Novartis Board is currently dominated by the defendants on the Board who

10    were personally involved in the acts of mismanagement alleged herein. Such dominance

11    renders the Board incapable of reaching an independent decision whether to accept any

12    action by plaintiff to address the wrongs detailed herein.

13    **B.**    **The Director Defendants' Wrongful Acts Are Not Protected By The Business**

14    **Judgment Rule**

15    93.    Furthermore, demand is excused because the misconduct complained of

16    herein was not, and could not have been, an exercise of good faith business judgment.

17    Making a demand on the Board of Directors is excused if there is reasonable doubt that

18    the challenged transactions were the product of a valid exercise of business judgment and,

19    therefore, are entitled to the protection of the business judgment rule. To benefit from the

20    protection of the business judgment rule, a director must be informed of all material

21    information reasonably available and, being so informed, the director must act with

22    requisite care in discharging his or her duties. To meet the standard of care, in light of the

23    information which the directors knew, they were obligated to take actions in the best

24    interests of the Company, to the exclusion of the directors' personal pecuniary interests,

25    conduct full and adequate investigation into decisions affecting the Company and its

26    assets, and ensure that the Company is in compliance with applicable laws and

27    regulations.

28

1    94.    Because the director defendants engaged in acts of misconduct and

2 wrongdoing, as described above, those acts were not the product of a valid exercise of

3 business judgment and not entitled to the protections of the business judgment rule. The

4 directors failed to act to protect the interests and business assets of Novartis, and failed to

5 ensure that Novartis complied with relevant laws and regulations. Failure to take such

6 protections could not have been a valid exercise of business judgment. In addition, the

7 practice of promoting off-label uses of trileptal, and potentially of TOBI, has exposed

8 Novartis to liability. Further, the Novartis director defendants face a substantial

9 likelihood of liability for their individual conduct and, thus, are incapable of making a

10 disinterested decision about whether to pursue the claims asserted herein.

11    95.    Accordingly, demanding that the directors take action before this lawsuit

12 was filed would have been futile and, therefore, the demand requirement is excused.

13 **VII.    CAUSES OF ACTION**

14                          **FIRST CAUSE OF ACTION**

15                          **BREACH OF FIDUCIARY DUTY**

16    96.    Plaintiff incorporates by reference the allegations set forth above as though

17 fully restated herein.

18    97.    Defendants, as Novartis' directors and officers, were and are required to use

19 their abilities to control and oversee Novartis in a fair, just and equitable manner in order

20 to ensure that the Company complied with applicable laws and regulations governing

21 pharmaceutical products, to refrain from abusing their positions of control, and not to

22 favor their own interests at the expense of Novartis. Defendants violated their fiduciary

23 duties to Novartis, including without limitation their duties of care and good faith.

24    98.    The wrongful conduct particularized herein was not due to an honest error

25 in judgment, but rather to defendants' gross mismanagement, bad faith and/or reckless

26 disregard of the rights and interests of Novartis and its shareholders, and without

27 reasonable and ordinary care which they owed to Novartis.

28

1    99.    As a result of the foregoing, defendants have participated in harming

2  Novartis and have breached fiduciary duties owed to Novartis. Defendants knowingly

3  aided, encouraged, cooperated and/or participated in, and substantially assisted the other

4  defendants in the breaches of their fiduciary duties.

5    100.    By reason of the foregoing, Novartis has sustained and will continue to

6  sustain damages and injuries for which it has no adequate remedy at law.

7    101.    The acts of defendants named herein, and each of them, were done

8  maliciously, oppressively, and with intent to defraud; and plaintiff on behalf of Novartis

9  is entitled to punitive and exemplary damages in an amount to be shown according to

10  proof at the time of trial.

11                          **SECOND CAUSE OF ACTION**

12                          **ABUSE OF CONTROL**

13    102.    Plaintiff incorporates by reference the allegations set forth above as though

14  fully restated herein.

15    103.    By virtue of their positions and financial holdings in Novartis, defendants

16  exercised control over Novartis and its operations, and owed duties as controlling persons

17  to Novartis not to use their positions of control within the Company for their own

18  personal interests and contrary to the interest of Novartis.

19    104.    Defendants' conduct amounts to an abuse of their control of Novartis, in

20  violation of their obligations to Novartis. Defendants knowingly aided, encouraged,

21  cooperated and/or participated in, and substantially assisted the other defendants in their

22  abuse of control.

23    105.    As a result of defendants' abuse of control, Novartis has sustained and will

24  continue to sustain damages and injuries for which it has no adequate remedy at law.

25    106.    The acts of defendants named herein, and each of them, were done

26  maliciously, oppressively, and with intent to defraud; and plaintiff on behalf of Novartis

27  is entitled to punitive and exemplary damages in an amount to be shown according to

28  proof at the time of trial.

LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

SHAREHOLDER DERIVATIVE COMPLAINT

31

1

**THIRD CAUSE OF ACTION**

2

**UNJUST ENRICHMENT**

3    107.    Plaintiff incorporates by reference the allegations set forth above as though

4    fully set forth herein.

5    108.    Defendants were unjustly enriched by their receipt of compensation, fees,

6    and other benefits during the time in which the wrongful conduct occurred.  It would be

7    unconscionable to allow them to retain the benefits thereof.

8    109.    Defendants' enrichment is directly and causally related to the detriment of

9    Novartis.

10    110.    Defendants accepted the benefit under such circumstances that it would be

11    inequitable for them to retain it without payment.  As alleged above, defendants breached

12    their fiduciary duties and/or abused their positions of control to Novartis and therefore

13    defendants are not justified to retain the benefits conferrred upon them.  As a result of

14    defendants' wrongful conduct, Novartis has suffered and continues to suffer economic

15    losses and non-economic losses, all in an amount to be determined according to proof at

16    the time of trial.

17    **VIII.  PRAYER FOR RELIEF**

18        WHEREFORE, Plaintiff, on behalf of Novartis, prays for judgment as follows:

19    1.    Awarding damages against all defendants, jointly and severally, in an

20        amount to be proven at trial;

21    2.    Awarding restitution, disgorgement of all illicit proceeds generated as a

22        result of the wrongful conduct alleged herein, and punitive damages;

23    3.    Awarding appropriate equitable relief;

24    4.    Awarding pre-judgment interest, as well as reasonable attorneys' fees and

25        other costs; and

26    5.    Awarding such other relief as this Court may deem just and proper.

27

28

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

**SHAREHOLDER DERIVATIVE COMPLAINT**

32

1   **IX.   JURY TRIAL DEMAND**

2        Plaintiff, pursuant to Federal Rule of Civil Procedure 38, demands a trial by jury of

3   all issues which are subject to adjudication by a trier of fact.

4   Dated: April 23 , 2008

5   **ENGSTROM, LIPSCOMB & LACK**        **COTCHETT, PITRE & McCARTHY**

7   By: _____        By: _____
           Walter J. Lack                     Mark C. Molumphy

9   *Attorneys for Plaintiff GREG SARANDI, Trustee of Next Phase Marketing, Inc. Defined Benefit Plan and Trust, derivatively on behalf of Novartis AG (Novartis, Inc.)*

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

## VERIFICATION

I, GREG SARANDI, Trustee of Next Phase Marketing, Inc. Defined Benefit Plan and Trust, hereby declare as follows:

I am a named Plaintiff. I am also a shareholder of Novartis AG (also known as Novartis, Inc.) and have been during the relevant time pertinent hereto. I certify under penalty of perjury that I have reviewed the foregoing Shareholder Derivative Complaint alleging violations of federal law and authorize its filing and, based upon the investigation of my counsel, that the contents in the Shareholder Derivative Complaint are true to the best of my knowledge, information and belief.

Date: _April 22_ , 2008

6-K 1 a2161026z6-k.htm 6-K
<u>QuickLinks</u> -- Click here to rapidly navigate through this document

# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 6-K

### REPORT OF FOREIGN PRIVATE ISSUER
### PURSUANT TO RULE 13a-16 or 15d-16 OF
### THE SECURITIES EXCHANGE ACT OF 1934

**Report on Form 6-K dated July 21, 2005**
**(Commission File No. 1-15024)**

*This Report on Form 6-K shall be incorporated by reference in our Registration Statements on Form F-3 as filed with the Commission on May 11, 2001 (File No. 333-60712) and on January 31, 2002 (File No. 333-81862) and our Registration Statements on Form S-8 as filed with the Commission on October 1, 2004 (File No. 333-119475) and on May 14, 2001 (File No. 333-13506), in each case to the extent not superseded by documents or reports subsequently filed by us under the Securities Act of 1933 or the Securities Exchange Act of 1934, in each case as amended*

# Novartis AG

(Name of Registrant)

**Lichtstrasse 35**
**4056 Basel**
**Switzerland**
(Address of Principal Executive Offices)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F:

**Form 20-F: ☒**   Form 40-F: ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1):

Yes: ☐   **No: ☒**

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7):

Yes: ☐   **No: ☒**

*Investigations:*    From time to time, our affiliates may be the subject of government investigations arising out of the normal conduct of their business. Consistent with the Novartis Code of Conduct and policies regarding compliance with law, it is our policy to cooperate with such investigations.

- **US enteral pump market:** On February 11, 2005, two Novartis Medical Nutrition affiliates in the US settled possible claims against them arising from an investigation of the enteral pump industry by the United States Department of Justice. The settlement included a plea of guilty by one of the affiliates, OPI Properties, to attempted obstruction of a Medicare audit for which OPI Properties paid a USD 4.5 million fine, and a civil agreement pursuant to which the other affiliate, Novartis Nutrition Corporation, paid USD 44.65 million in civil damages.

- *Trileptal*: On May 26, 2005, the US Attorney's Office for the Eastern District of Pennsylvania served an administrative subpoena pursuant to the Health Insurance Portability and Accountability Act on Novartis Pharmaceuticals Corporation. We understand that the US Attorney's Office is conducting parallel civil and criminal investigations into allegations of potential off-label promotion of *Trileptal*. At this time, we are unable to express an opinion as to the likely outcome of these investigations.

## 6. Significant differences between IFRS and US Generally Accepted Accounting Principles (US GAAP) (unaudited)

The Group's consolidated financial statements have been prepared in accordance with IFRS, which, as applied by the Group, differs in certain significant respects from US GAAP. The effects of the application of US GAAP to net income and equity are set out in the tables below.

The adjustments have been explained in note 32 of the Novartis 2004 annual report. Adoption of new IFRS and US GAAP standards from January 1, 2005, have led to the following additional adjustments being recorded:

### Pension and other post-employment benefits

Under the Group's adoption of new IFRS guidelines, actuarial gains and losses arising from changes in the fair value of assets and liabilities in the Group's pension and post-employment defined benefit plans are recognized immediately in equity. Under US GAAP, these differences are recognized immediately in the income statement only when they exceed specified levels.

### Research & Development

IFRS requires capitalization of acquired R&D and in-process R&D, which, under certain circumstances, require expensing under US GAAP.

### Inventory

The Group changed its external US GAAP reporting of inventories held by certain subsidiaries from the Last-In-First-Out ("LIFO") method to the First-In-First-Out ("FIFO") method. This change has been applied by restating prior years' US GAAP equity.

### Share-based compensation

The Group has elected to adopt FAS 123(revised) on Share-Based Payment from January 1, 2005, with retroactive application as far as permitted by the standard. However, not all amounts can be retroactively restated and there are differences in the transitional rules, which results in a new difference in the income statement between IFRS and US GAAP.

27

20-F 1 a2182117z20-f.htm 20-F

QuickLinks -- Click here to rapidly navigate through this document

As filed with the Securities and Exchange Commission on January 28, 2008

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington D.C. 20549

## FORM 20-F

☐ REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 for the fiscal year ended December 31, 2007

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

OR

☐ SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission file number 1-15024

# NOVARTIS AG
*(Exact name of Registrant as specified in its charter)*

# NOVARTIS Inc.
*(Translation of Registrant's name into English)*

## Switzerland
*(Jurisdiction of incorporation or organization)*

**Lichtstrasse 35**
**4056 Basel, Switzerland**

*(Address of principal executive offices)*

Securities registered pursuant to Section 12(b) of the Act:

Thomas Werlen
Group General Counsel
Novartis AG
CH-4056 Basel
Switzerland
011-41-61-324-2745
thomas.werlen@novartis.com
(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

| Title of class | Name of each exchange on which registered |
|---|---|
| American Depositary Shares each representing 1 share, nominal value CHF 0.50 per share, and shares | New York Stock Exchange, Inc. |

Securities registered or to be registered pursuant to Section 12(g) of the Act:

## Gender discrimination

Certain female pharmaceutical sales representatives brought a lawsuit at the Federal Court in New York against, among others, several US Novartis subsidiaries, alleging that they were discriminated against because of their gender. The district court granted, in part, plaintiffs' motion for class certification against one of the US Novartis subsidiaries. The court dismissed all other US Novartis subsidiaries from the case. Discovery is ongoing and trial is scheduled for early 2009.

## *Trileptal* investigation

The US Attorney's Office for the Eastern District of Pennsylvania served an administrative subpoena pursuant to the Health Insurance Portability and Accountability Act on a Novartis subsidiary. Novartis understands that the US Attorney's Office is conducting parallel civil and criminal investigations into allegations of potential off-label promotion of *Trileptal*. At this time, Novartis is unable to express an opinion as to the likely outcome of these investigations.

## Wage and hour litigation

A group of pharmaceutical sales representatives filed suit in State Court in California and in Federal Court in New York against US Novartis subsidiaries alleging that the companies violated wage and hour laws by misclassifying the sales representatives as "exempt" employees, and by failing to pay overtime compensation. The lawsuits were consolidated and certified as a class action. Discovery is ongoing and trial is scheduled for late 2008.

The following table shows the movements in the legal and product liability provisions during 2007, 2006 and 2005:

|  | 2007 | 2006 | 2005 |
|---|---|---|---|
|  | $ millions | $ millions | $ millions |
| **January 1** | 903 | 825 | 1,012 |
| Impact of business combinations | 25 | 46 | 79 |
| Cash payments | (225) | (159) | (249) |
| Releases of provisions | (98) | (56) | (107) |
| Additions to provisions | 403 | 233 | 115 |
| Currency translation effects | 18 | 14 | (25) |
| **December 31** | 1,026 | 903 | 825 |
| Less current liability | (349) | (269) | (204) |
| **Total non-current liability at December 31** | 677 | 634 | 621 |

Novartis believes that its total provisions for legal and product liability matters are adequate based upon currently available information, however, given the inherent difficulties in estimating liabilities, it cannot be guaranteed that additional costs will not be incurred beyond the amounts provided.

F-58

JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS
Greg Sarandi, Trustee of Next Phase Marketing, Inc., Defined Benefit Plan and Trust, derivatively and on behalf of Novartis AG (Novartis, Inc.)

## DEFENDANTS
Raymond Breu, et al. (SEE ATTACHMENT)

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

*E-filing*

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Cotchett Pitre & McCarthy
840 Malcolm Road, Burlingame, CA 94010
(650)697-6000

Attorneys (If Known)

*JCS*    **ADR**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | Exchange |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | | ☐ 892 Economic Stabilization Act |
| | | | ☐ 740 Railway Labor Act | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | or Defendant) | ☐ 900 Appeal of Fee |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | **IMMIGRATION** | 26 USC 7609 | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – | | ☐ 950 Constitutionality of |
| | Other | | Alien Detainee | | State Statutes |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ 6 Multidistrict Litigation    ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332(a)(2)

Brief description of cause:
Breach of Fiduciary Duty; Abuse of Control and Unjust Enrichment

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $    CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)    ☒ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE

DATE
4/23/08

SIGNATURE OF ATTORNEY OF RECORD

U.S. District Court
Northern District of California
San Francisco Division

[ATTACHMENT]

**GREG SARANDI, Trustee of Next Phase Marketing, Inc. Defined Benefit Plan and Trust**,
derivatively and on behalf of Novartis AG (Novartis. Inc.),

     Plaintiff,

vs.

**RAYMOND BREU, BIRGIT BREUEL,
PETER BURCKHARDT, SRIKANT DATAR,
WILLIAM W. GEORGE, ALEXANDRE F. JETZER, PIERRE LANDOLT, ULRICH
LEHNER, HANS-JOERG RUDLOFF, HELMUT SIHLER, DANIEL VASELLA,
WENDELIN WIEDEKING,
ROLF M. ZINKERNAGEL,
and Does 1-50, inclusive,**

     Defendants,

and

**NOVARTIS AG (Novartis, Inc.),**

     Nominal Defendant.