1 | Joseph W. Cothchett (36324; jcotchett@cpmlegal.com)
Mark C. Molumphy (168009; mmolumphy@cpmlegal.com)
2 | Nanci E. Nishimura (152621; nnishimura@cpmlegal.com)
Gerald S. Ohn (217382; gohn@cpmlegal.com)
3 | **COTCHETT, PITRE & McCARTHY**
840 Malcolm Road, Suite 200
4 | Burlingame, CA 94010
Telephone: (650) 697-6000
5 | Facsimile: (650) 697-0577

6 | Walter J. Lack (57550; wlack@elllaw.com)
Elizabeth L. Crooke (90305; ecrooke@elllaw.com)
7 | Richard P. Kinnan (123170; rkinnan@elllaw.com)
**ENGSTROM, LIPSCOMB & LACK**
8 | 10100 Santa Monica Blvd., 16th Floor
Los Angeles, CA 90067
9 | Telephone: (310) 552-3800
Facsimile: (310) 552-9434

10 |

11 | *Attorneys for Plaintiff GREG SARANDI, Trustee of Next Phase*
*Marketing, Inc. Defined Benefit Plan and Trust,*
*derivatively on behalf of Novartis AG (Novartis, Inc.)*

12 |

13 | **UNITED STATES DISTRICT COURT**

14 | **NORTHERN DISTRICT OF CALIFORNIA**

15 | **OAKLAND DIVISION**

16 |

17 | **GREG SARANDI, Trustee of Next Phase Marketing, Inc. Defined Benefit Plan and Trust**, derivatively and on behalf of Novartis AG (Novartis. Inc.),

Case No. C 08-02118 SBA

18 |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

19 | Plaintiff,

20 | vs.

Date: April 28, 2009
Time: 1:00 p.m.
Courtroom: 3
Hon. Saundra Brown Armstrong

21 | **RAYMOND BREU, BIRGIT BREUEL, PETER BURCKHARDT, SRIKANT DATAR,**
22 | **WILLIAM W. GEORGE, ALEXANDRE F. JETZER, PIERRE LANDOLT, ULRICH LEHNER,**
23 | **HANS-JOERG RUDLOFF, HELMUT SIHLER, DANIEL VASELLA, WENDELIN WIEDEKING,**
24 | **ROLF M. ZINKERNAGEL,**
**and Does 1-50, inclusive,**

25 | Defendants,

26 | and

27 | **NOVARTIS AG (Novartis, Inc.),**

28 | Nominal Defendant.

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Overview of Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    Plaintiff's Standing To Bring Suit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.    The Off-Label Marketing Scheme. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.    The Close Relationship Between Novartis and Chiron. . . . . . . . . . . . . . . 3

        2.    The Approved Use Of TOBI And Trileptal. . . . . . . . . . . . . . . . . . . . . 4

        3.    Defendants' Promotion of Off-Label Uses of Drug Products . . . . . . . . . . 5

        4.    Novartis' Board Failed To Stop The Illegal Practices. . . . . . . . . . . . . . . 6

    D.    A Substantial Portion of The Underlying Events Occurred in This District . . . . . 7

III.  NOVARTIS HAS REFUSED TO PARTICIPATE IN COURT-ORDERED DISCOVERY, EVEN ON ISSUES RAISED IN ITS MOTION TO DISMISS. . . . . . . . 8

IV.   ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.    The Parties Agreed That New York Law Applies To This Action. . . . . . . . . . . . 9

    B.    Plaintiff Properly Alleges Demand Futility. . . . . . . . . . . . . . . . . . . . . . . . . . 15

        1.    Failure to Exercise Business Judgment. . . . . . . . . . . . . . . . . . . . . . . . 15

        2.    Failure to Stay Informed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        3.    Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    C.    This District Is An Appropriate Forum. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        1.    Private Interest Factors Favor Adjudication in This District. . . . . . . . . . . 19

            a.    On Balance, This District is More Convenient for the Parties and Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            b.    Access to Evidence and Other Sources of Proof. . . . . . . . . . . . . 20

            c.    Cost of Bringing Witnesses to Trial. . . . . . . . . . . . . . . . . . . . . . 20

            d.    Enforceability of Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . 21

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

2.    The Public Interest Factors Favor This District . . . . . . . . . . . . . . . . . . . . 21

    a.    This District Has a Strong Interest in the Lawsuit. . . . . . . . . . . 21

    b.    Court's Familiarity with Governing Law. . . . . . . . . . . . . . . . . . . 22

D.    Plaintiff Properly Alleges Continuous Ownership.. . . . . . . . . . . . . . . . . . . . . . . . 22

VI.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

**CASES**

*Altmann v. Republic of Austria*
    317 F.3d 954 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Auerbach v. Bennett*
    47 NY2d 619 (NY 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Barr v Wackman*
    36 NY2d 371, N.E.2d 180, 368 N.Y.S.2d 497 (1975).. . . . . . . . . . . . . . . . . . . . . . . . 16

*Batchelder v. Nobuhiko Kawamoto*
    147 F.3d 915 (9th Cir. Cal. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12

*Batchelder v. Nobuhiko Kawamoto*
    147 F.3d 915 (9th Cir. Cal. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Bateson v. Magna Oil Corp.*
    414 F.2d 128 (5th Cir. 1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*City of Harper Woods Employees' Ret. Sys. v. Olver*
    577 F. Supp. 2d 124 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*City of Sterling Heights Police & Fire Ret. Sys. V. Abbey Nat'l, PLC*
    423 F. Sup. 2d 348 (S.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Dole Food Co., Inc. v. Watts*
    303 F.3d 1104 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*E.ON AG v. Acciona, S.A.*
    468 F. Supp. 2d 559 (S.D.N.Y. 2007) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Gates Learjet Corp. v. Jensen*
    743 F.2d 1325 (9th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*In re Bank of New York Derivative Litig.*
    173 F. Supp. 2d 193 (S.D.N.Y. Nov. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Lueck v. Sundstrand Corp.*
    236 F.3d 1137 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

*Marine Midland Bank, N.A. v. United Missouri Bank, N.A.*
    223 A.D.2d 119, 643 N.Y.S.2d 528, 530 (N.Y. App. Div. 1996) . . . . . . . . . . . . . . . 12

*Marx v Akers*
    88 NY2d 189, 198, 666 N.E.2d 1034 (N.Y. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Matter of Comverse Tech., Inc.*
    56 A.D.3d 49, 53-54, 866 N.Y.S.2d 10, 2008 N.Y. App. Div.
    LEXIS 7439, 2008 NY Slip Op 7595 (N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 15-18

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

*Miller v Schreyer*
    257 AD2d 358 N.Y.S.2d 51 (N.Y. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Northrop Corp. v. Triad Int'l Marketing S.A.*
    811 F.2d 1265 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Pinker v. Roche Holdings, Ltd.*
    292 F.3d 361 (3rd Cir. N.J. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 22

*Republic of Austria v. Altmann*
    541 U.S. 677 124 S. Ct. 2240 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*San Francisco Baseball Associates, L.P. v. Ravelo Monegro*
    531 U.S. 1112 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Scherk v. Alberto-Culver Co.*
    417 U.S. 506, 516-20, 41 L. Ed. 2d 270, 94 S. Ct. 2449 (1974). . . . . . . . . . . . . . . . . 12

*Seybold v. Groenink*
    2007 WL 737502 (S.D.N.Y. Mar. 12, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Tomran, Inc. v. Passano*
    891 A.2d 336 (Md. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

# I.   INTRODUCTION

By their motion to dismiss, Defendants assert that plaintiff Greg Sarandi, a United States citizen who invested substantial funds to purchase American Depository Shares or "ADS" of Novartis, is nonetheless legally precluded from bringing a derivative action in the United States. The motion to dismiss should be denied in its entirety.

First, Defendants assert that Swiss law governs the substantive rights of ADS holders in the United States to bring a derivative action, notwithstanding the fact that Novartis drafted and asked all United States investors to agree to a Deposit Agreement which plainly provides that New York law governs their rights. Indeed, rather than address the relatively straightforward choice-of-law clause that governs this issue, Defendants instead devote the majority of their memorandum and exhibits addressing Swiss law on derivative lawsuits and ADS agreements used by other, unrelated companies. Curiously, Defendants also rely on the Ninth Circuit's opinion in *Batchelder v. Nobuhiko Kawamoto*, 147 F.3d 915 (9th Cir. Cal. 1998), even though the Court there upheld the contractual choice-of-law provision in the ADS agreement. Thus, *Batchelder* supports Plaintiff's position here.

Second, Defendants assert that, under applicable New York law, Plaintiff has failed to allege sufficient facts to demonstrate the futility of demand. However, Plaintiff has alleged detailed facts which, if true (as presumed at this pleading stage), create a reasonable doubt that a majority of Novartis' Board is capable of evaluating a demand to sue themselves. Put simply, the alleged facts demonstrate that Defendants failed to exercise reasonable business judgment in permitting Novartis to promote the off label use of its most profitable drugs, despite the massive exposure that off label promotion presented to Novartis. These chickens have now come to roost, with government investigations now pending on at least two of their primary drugs, and the resulting expenses to Novartis. At a minimum, demand is futile based on the Board's failure to properly inform themselves of such patently illegal practices.

Third, Defendants ask the Court to dismiss the case on forum non conveniens grounds, claiming that it would be more "convenient" to have the case litigated in Switzerland. Of course, Defendants' real motivation is to make it prohibitively difficult and expensive for a United States

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

shareholder to bring a suit.  Indeed, other than the fact that some of the individual  defendants
reside in Switzerland, there is relatively little connection with Switzerland.  The conduct at issue,
i.e., the off-label marketing of drugs, occurred in the United States, including in this District.
The government investigations are occurring in the United States.  Most of the key witnesses and
documentary evidence is located here, not in Europe.  This District has a strong interest in this
action and the balance of relevant private and public factors weigh in favor of adjudication here.

Finally, Plaintiff has properly alleged continuing ownership of Novartis stock.

For all of these reasons, the motion to dismiss should be denied.

## II.     STATEMENT OF FACTS

### A.     Overview of Action

Plaintiff filed his Shareholder Derivative Complaint on April 23, 2008, on behalf of
nominal defendant Novartis AG ("Novartis" or the "Company") against certain present and
former directors and officers related to the "off-label" promotion of Trileptal and TOBI.
Plaintiff has alleged, and Novartis has now admitted in court filings, that the government is now
investigating the company regarding these very same practices.  Declaration of Gerald Ohn
("Ohn Decl."), ¶ 2, Ex. A.

Plaintiff alleges that the individual defendants, including a majority of Novartis' Board,
breached their fiduciary duties of care and good faith by, among other things, permitting Novartis
Pharmaceutical Corporation ("NPC") (a Novartis subsidiary) and Chiron Corporation (a Novartis
"business unit"), to market and promote "off-label uses" of Trileptal and TOBI, and concealing
the off-label promotion of its products from shareholders and the appropriate regulatory agencies.
As a result, Plaintiff claims that the Company has incurred expenses, exposed itself to federal
government investigation and potentially millions of dollars in fines and/or penalties, and
suffered reputational harm.

Plaintiff alleges claims for breach of fiduciary duty, abuse of control and unjust
enrichment.  Plaintiff seeks the following relief on behalf of the Company: (1) damages sustained
by the Company as a result of the individual defendants' alleged breaches of fiduciary duty and
abuse of control; (2) restitution, disgorgement of illicit proceeds generated as a result of the



LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

alleged misconduct and punitive damages; (3) appropriate equitable relief; and (4) pre-judgment interest, reasonable attorneys' fees and other costs.

### B.  Plaintiff's Standing To Bring Suit

Plaintiff owns Novartis ADS and has continuously held such stock at all times relevant hereto. *Id.* ¶ 15, 16.

An ADS holder holds shares pursuant to the Deposit Agreement, dated as of December 17, 1996, and amended as restated as of May 11, 2000, among the Company, Morgan Guaranty Trust Company of New York, as depositary, and the registered Holders from time to time of the American Depositary Receipts ("ADR") issued thereunder.  The Deposit Agreement is governed by and shall be construed in accordance with the laws of New York. *Id.* ¶ 17.

ADRs are American Depositary Receipts executed and delivered pursuant to the terms of the Deposit Agreement.  An ADR is a physical certification or Direct Registration that evidences a certain number of ADSs.  Only persons in whose names ADRs are registered on the books of the Depositary will be treated by the Depositary and the Company as Holders. *Id.* ¶ 18.

### C.  The Off-Label Marketing Scheme

This action concerns Defendants promotion of "off-label" uses of Trileptal and TOBI.  An off-label use is a use other than those mentioned on the drug's Food and Drug Administration ("FDA") approved label, which states the conditions for which the drug has been shown to be safe and effective.  The FDA prohibits pharmaceutical companies from marketing or promoting off-label uses of their drugs without its formal approval. *Id.* ¶¶ 1-2.

#### 1.  The Close Relationship Between Novartis and Chiron

In 1995, Novartis and Chiron entered into the Governance Agreement, under which Novartis agreed not to increase its ownership stake in Chiron above 55% unless it acquired all of Chiron's outstanding capital stock in a "buy-out transaction."  Under a series of agreements, Novartis' ownership interest in Chiron was 49.9% in January 1995.  As a result of subsequent stock issuances by Chiron, Novartis' ownership interest was approximately 42.2% as of December 31, 2002, and 43.9% as of December 31, 2005. *Id.* ¶¶ 46-48.

The Governance Agreement provided that as long as Novartis held at least 40% of Chiron's outstanding common stock, Chiron could not enter into certain transactions without Novartis' approval. The Governance Agreement further gave Novartis the right to nominate **three** of Chiron's ten member Board of Directors. At the time of the Merger, the three investor directors were Raymond Breu ("Breu"), Pierre E. Douaze ("Douaze"), and Paul L. Herrling ("Herrling"). All three had close and long-standing ties to Novartis and were Chiron directors since at least 1999. As directors designated by Novartis, the investor directors acted as a conduit of information between the Chiron and Novartis Boards regarding Chiron's business practices, including its promotion of TOBI. *Id.* ¶¶ 49-52.

Since the beginning of their relationship in 1995, Novartis and Chiron entered into numerous research and development and financial agreements, including the Investment Agreement, the Cooperation and Collaboration Agreement, the Market Price Option Agreement, and the Subscription Agreement. Through these various agreements Novartis was able to exert substantial control over Chiron in taking an active role by controlling and monitoring Chiron's financial and business affairs. *Id.* ¶¶ 54-56.

In April 2006, Novartis completed its acquisition of the remaining 56% of the outstanding publicly held common shares of Chiron that it did not already own for $48 per share, or approximately $5.3 billion. At this time, Chiron merged into Novartis and became a part of the Novartis group of companies. *Id.* ¶ 21.

## 2. The Approved Use Of TOBI And Trileptal

In December 1997, the FDA approved the drug-device combination TOBI (tobramycin solution for inhalation) as a treatment for cystic fibrosis-related lung functions. TOBI is a particular concentration of tobramycin solution for inhalation in the Pari LC Plus nebulizer (a delivery device). The FDA's approval allowed PathoGenesis Corporation, which then owned the rights to TOBI, to market and make representations about the safety and efficacy of TOBI as a treatment *only* for cystic fibrosis-related lung functions, and *only* in a concentration of 60 mg/ml to be used in conjunction with the Pari LC Plus nebulizer. *Id.* ¶ 59.

In September 2000, Chiron acquired PathoGenesis Corporation, thereby acquiring the rights to market TOBI pursuant to the FDA approved use Chiron was aware that the **only** FDA-approved use of TOBI was for cystic fibrosis patients with *Pseudomonas aeruginosa* lung infections and is the first and only inhaled antibiotic solution to be approved by the FDA for cystic fibrosis. *Id.* at ¶¶ 60 and 62.

TOBI has been successful in decreasing the effects of cystic fibrosis, improving lung function and reducing the number and duration of hospital stays. *Id.* ¶ 60. Due to TOBI's efficacy and Chiron's promotion of the drug, it became one of their top selling-drugs, and sales increased dramatically in the years prior to the Merger. Between 2002 and 2005, Chiron had $147 million, $172 million, $213 million, $233 million in TOBI sales respectively. There was a 17% increase in sales in 2003, 23.7% increase in 2004 and 9.3% increase in 2005. In 2005 alone, TOBI accounted for **12%** of Chiron's $1.9 billion in sales and was marketed throughout the United States, the European Union, Canada, Switzerland, Norway, Israel, Argentina and Brazil. *Id.* at ¶ 63.

In 2000, the FDA only approved trileptal for the treatment of partial seizures as monotherapy in adults or adjunctive therapy (use in combination with other anticonsulvant drugs) in adults and children as young as 4 years. Since then, the FDA has approved the use of trileptal as monotherapy in children (in 2003) and as adjunctive therapy for partial seizures in epileptic children aged 2 to 4 years (in 2005). *Id.* ¶ 76.

Due to Novartis' promotion of trileptal, the drug became one of their top selling pharmaceuticals worldwide. In the U.S. alone, sales of trileptal were $305 million in 2003; $391 million in 2004; $462 million in 2005; $549 million in 2006; and $500 million in 2007. *Id.* ¶ 77.

### 3. Defendants' Promotion of Off-Label Uses of Drug Products

As described in detail above, TOBI sales increased dramatically between 2002 and 2005 due to Chiron's promotion efforts. Both before and after the Merger, Chiron actively promoted Trileptal and TOBI, for off-label uses. *Id.* ¶¶ 64-65. Publicly available documents and postings show that Chiron engaged in off-label promotion practices regarding TOBI. *Id.* At ¶¶ 68-70. Another example of Chiron training the U.S. TOBI sales force to promote the various uses of

LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

TOBI was Chiron's annual North American Sales Meeting from February 10-14, 2003 at the Grand Hyatt Hotel in San Francisco. Senior executives, including Sean P. Lance (then President, CEO, and Chairman of the Board of Chiron) and Craig A. Wheeler (then Vice President of Chiron, and President of Chiron Biopharmaceuticals), gave overview presentations about Chiron and specific marketing programs and sales operations for TOBI were discussed. One key issue was finding ways to maximize TOBI sales. *Id*. at ¶ 66-67.

Chiron was fully aware of the legal and business risks of the off-label promotion of its drug products. In its 2005 Form 10-K filing, Chiron acknowledged: "FDA law and regulations **prohibit** the marketing and promotion of ... **unapproved uses** of drug and device products." (emphasis added) Chiron also stated:

> If we market products in a manner that violates state, federal or foreign laws that govern pharmaceuticals and health care products, including FDA, FTC, and health care fraud and abuse laws, we may be subject to **civil or criminal penalties**, including the potential for exclusion from federal, state and foreign programs."
> *Id.* (emphasis added)

Moreover, Chiron knew that other pharmaceutical companies had been investigated and fined for **"engaging in 'off-label' promotion that caused claims to be submitted to federal and state programs for non-covered off-label uses**." (emphasis added) *Id.* ¶ 71.

Despite knowing about the illegality and financial risks of off-label promotion, public postings indicate that Chiron may have encouraged and trained its TOBI sales force to use some of these same tactics to promote off-label uses of TOBI. Novartis' Board failed to take action to stop any off-label promotion. Also, during much of this same period of time, Novartis' Board was facing similar allegations regarding the off-label promotion of another drug product, trileptal. *Id.* ¶¶ 74-75.

### 4. Novartis' Board Failed To Stop The Illegal Practices

The majority of Novartis' current directors were also directors during the time that NPC promoted the off-label use of trileptal and when Chiron promoted the off-label usage of TOBI. The current Novartis Board members are Peter Burckhardt ("Burckhardt"), Srikant Datar ("Datar"), Ann Fudge ("Fudge"), William W. George ("George"), Alexandre F. Jetzer ("Jetzer"), Pierre Landolt ("Landolt"), Ulrich Lehner ("Lehner"), Hans-Joerg Rudloff ("Rudloff"), Daniel

LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

Vasella ("Vassella"), Andreas von Planta ("von Planta"), Wendelin Wiedeking ("Wiedeking"), Marjorie M. Yang ("Yang"), and Rolf M. Zinkernagel ("Zinkernagel") *Id.* ¶¶ 88-90. All the Board members named as defendants benefitted financially from fees, shares and compensation earned for their services as a Novartis director. *Id.* at 90. More significantly, the individual defendants knew about the off-label marketing or "recklessly disregarded" this knowledge and did nothing to stop it. *Id.* ¶¶ 5, 6, 91.

    **D.**     **A Substantial Portion of The Underlying Events Occurred in This District**

A substantial part of the events underlying the case allegedly occurred in this District. Indeed, Plaintiff alleges the following facts and events about Chiron's promotion of TOBI, many of which occurred in this District. *Id.* ¶¶ 13-14.

- Chiron is headquartered in <u>Emeryville, California</u>. *Id.* ¶ 22.

- Defendant Raymond Breu, the Chief Financial Officer of Novartis, was a director of Chiron from 1999 to 2006. *Id.* ¶ 24.

- From 1995 until the merger in 2006, Novartis and Chiron had extensive and close ties because of Novartis' ownership stake in Chiron. *Id.* ¶¶ 21, 46-47. Through a series of agreements, Novartis exerted substantial control over Chiron's financial and corporate governance, including the right to nominate three of Chiron's ten Board members. *Id.* ¶¶ 48-56.

- Chiron developed and marketed TOBI in this district. *Id.* ¶¶ 57-65. At a 2003 sales meeting in <u>San Francisco</u>, Chiron began to train its sales force to promote TOBI for various uses. *Id.* ¶ 66. The training coincided with a broader effort to maximize TOBI sales, and this effort was supervised and coordinated through Chiron headquarters in <u>Emeryville</u>. *Id.* ¶¶ 65, 67.

- Publicly available postings indicate that Chiron promoted off-label uses of TOBI. *Id.* ¶¶ 68-70. Chiron promoted off-label uses of TOBI despite knowing the legal and business risks of promoting drugs off-label. *Id.* ¶ 71.

NPC is headquartered in East Hanover, New Jersey. *Id.* ¶ 1. On July 21, 2005, Novartis disclosed that the U.S. Attorney's Office for the Eastern District of Pennsylvania had

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

commenced parallel civil and criminal investigations into the off-label promotion of Trileptal, which is still pending. *Id.* ¶ 5.

## III. NOVARTIS HAS REFUSED TO PARTICIPATE IN COURT-ORDERED DISCOVERY, EVEN ON ISSUES RAISED IN ITS MOTION TO DISMISS

At the Case Management Conference on February 4, 2009, after consulting with the Parties and considering the positions raised in their Status Conference Statement, the Court ordered Defendants Datar and George and Nominal Defendant Novartis AG to file motions to dismiss on grounds other than lack of personal jurisdiction by March 3, 2009, with an expected hearing on April 7, 2009. In addition, while Defendants had proposed a stay of all discovery pending resolution of the motions to dismiss, <u>the Court informed the parties that discovery could move forward immediately</u>.

On February 12, 2009, Plaintiff served his First Set of Requests for Production of Documents seeking documents relating to Novartis' ADS agreements, as well as its pending investigations on off label marketing practices described in the Complaint. Similarly, on February 18, 2009, Plaintiff served his First Set of Interrogatories to Defendants seeking similar information. Ohn Decl., ¶¶ 3-4, Exs. B and C.

On March 3, 2009, Defendants Breu, Datar, George, Vasella and Zinkernagel and Nominal Defendant Novartis AG ("Moving Defendants") filed their motion to dismiss. However, in the intervening period, no hearings were available on April 7 and the hearing date was set on April 28, 2009 (Docket No. 49).

The parties met and conferred about extending the briefing schedule so that plaintiffs could have the opportunity to review Defendants' discovery responses prior to the date their opposition papers were due and, if appropriate, to incorporate relevant materials into their papers in response to Defendants' arguments. On March 12, 2009, the parties filed a Stipulation and Proposed Order re Briefing Schedule on Defendants' Motion to Dismiss, which provided for an additional ten days and allowed Plaintiff's to review discovery responses before filing their opposition. The Court granted the stipulated order.

1    Defendants served their responses to the documents requests on March 19, 2009 and to

2  the interrogatories on March 23, 2009.  However,  Defendants' responses consisted of blanket

3  objections with little substantive information.  No documents were produced.  Instead,

4  Defendants merely referred Plaintiffs' counsel to documents filed with Defendants' motion to

5  dismiss.  Ohn Decl., ¶¶ 7-8, Exs. F and G.

6    Subsequent meet and confer efforts were unsuccessful as Defendants refused to

7  supplement their responses. Ohn Decl., ¶¶ 9-10, Exs. H and I.

8  **IV.    ISSUES PRESENTED**

9    1.    Does the New York choice-of-law provision in the underlying ADS Depository

10         Agreement, drafted by Novartis and agreed to by all parties, govern this action?

11    2.    Has Plaintiff adequately alleged sufficient facts which, if true, show the futility of

12         making a pre-litigation demand?

13    3.    Should this action be adjudicated in this District where a substantial portion of the

14         underlying events occurred?

15    4.    Has Plaintiff properly alleged continuing ownership of Novartis shares?

16  **V.    ARGUMENT**

17    **A.    The Parties Agreed That New York Law Applies To This Action**

18    Defendants spend the majority of their brief, and most of their extrinsic evidence,

19  asserting that Swiss law governs the threshold issue of whether a holder of Novartis ADSs has

20  the right to bring a derivative action.  Defendants' argument misses the mark.

21    State law governs the substantive causes of action alleged in this case, since <u>the parties</u>

22  <u>agreed to New York choice-of-law in the relevant ADS agreement.</u>[1/]  Novartis' Deposit

23  Agreement states that the ADSs "<u>**shall be governed by and construed in accordance with the**</u>

24  <u>**laws of the State of New York**</u>."  Ohn Decl., ¶ 11, Ex. J.  The Deposit Agreement provides that

25  the Morgan Guaranty Trust Company of New York, a New York corporation ("Depository" or

26

27

---

[1]   Defendants state in their Motion that Plaintiff's complaint "concedes" that Swiss law
applies.  Not so.  The referenced paragraph 83 merely notes that Swiss law provides the right to
bring a derivative action and the fiduciary duties owed by directors and officers.

28

LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

"JP Morgan Chase"),[2/] Novartis, and the holders of Novartis ADSs such as Plaintiff are parties to the Agreement. Furthermore, "The Deposit Agreement is for the exclusive benefit of the Company, the Depository, [and] the Holders." Doc. 51-2, p. 35.

ADSs were created in 1927 to assist American investors who wanted to invest internationally, but were reluctant to do so due to regulatory and currency exchange difficulties. *See* Melissa Wilverding, Depository Receipts, II Global View (Brown Brothers Harriman), 2001, at 3. They also offered significant benefits to foreign companies, allowing them to tap into the American capital market. *See id.* They have since become one of the preferred methods for trading foreign securities in the United States, with the value of ADRs bought and sold annually in the hundreds of billions. *See* Bruce L. Hertz, American Depository Receipts, 600 P.L.I./Comm. 237, 239 (1992).

An ADS is a receipt that is issued by a depositary bank that represents a specified amount of a foreign security that has been deposited with a foreign branch or agent of the depositary, known as the custodian. *Id.* at 240-41. ADSs are tradeable in the same manner as any other registered American security, may be listed on any of the major exchanges in the United States or traded over the counter, and are subject to the Securities Act and the Exchange Act. *Id.* at 242, 246. This makes trading an ADS simpler and more secure for American investors than trading in the underlying security in the foreign market. *Id.* at 240.

ADSs may be either sponsored or unsponsored. An unsponsored ADS is established with little or no involvement of the issuer of the underlying security. A sponsored ADS, in contrast, is established with the active participation of the issuer of the underlying security. *Id.* at 242-43. An issuer who sponsors an ADS enters into an agreement with the depositary bank and the ADS owners. *Id.* at 243. The agreement establishes the terms of the ADSs and the rights and obligations of the parties, such as the ADS holders' voting rights. *Id.; see also*, *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 367 (3rd Cir. 2002).

---

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

[2]     As noted in Defendants' motion to dismiss, Morgan Guaranty Trust Company became JP Morgan Chase Bank, N.A. as a result of a November 10, 2001 merger.

Novartis's ADS program was clearly a "sponsored" one developed with the active participation of Novartis, the issuer of the underlying shares. Indeed, the Deposit Agreement was between Novartis, JP Morgan, and "all holders from time to time of American Depository Receipts issued hereunder." Doc. 51-2, p. 29. Thus, Plaintiff contracted with Novartis and pursuant to that agreement, deposited his ADSs. Plaintiff's ADSs along with those of other holders of ADSs, beneficial owners of Novartis stock, were offered through JP Morgan to obtain a listing on the New York Stock Exchange and to facilitate broad ownership of its shares with U.S. citizens such as Plaintiff. The Deposit Agreement contained the parties' understanding of their rights and obligations under it, as well as the terms of the ADSs. One of the provisions reflects the parties' agreement as to the law that applies in the interpretation of the agreement and the ADSs and, as well, that governs their rights under the ADSs and the agreement. That provision, ¶ 18, a choice-of-law provision, provides in pertinent part:

> The Deposit Agreement is for the exclusive benefit of the Company, the Depository, [and] the Holders . . . The Holders and Owners of the ADRs . . . shall be parties to the Deposit Agreement and shall be bound by all the provisions hereof. . . . The Deposit Agreement shall be governed by and construed in accordance with the laws of the State of New York.

Ohn Decl., ¶ 11, Ex. J.

Accordingly, under the Deposit Agreement, the parties agreed to a choice-of-law selecting New York law to govern all possible disputes regarding Plaintiff's rights both as an ADS holder and under the agreement. Put another way, New York law applies not only to the interpretation of the Deposit Agreement, but also defines all rights that exist under and by virtue of ownership of the ADSs.

Because the parties agreed clearly and specifically that the interpretation of the ADSs and the Deposit Agreement are to be governed by New York law, disputes regarding the meaning of the ADSs and the Deposit Agreement and the rights they accord should be resolved by reference to, and consistent with New York law.

In analyzing the validity of choice-of-law clauses, the Ninth Circuit has held that courts should enforce choice-of-law and choice-of-forum clauses in cases of "freely negotiated private international agreements." *Batchelder v. Nobuhiko Kawamoto*, 147 F.3d 915, 918 (9th Cir. Cal.

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

1998).  There is every reason to believe that the Depository Agreement was such an agreement.
*See* American Depository Receipts, Securities Act of 1933, Exchange Act Release Nos. 33-6984,
34-29226 (May 23, 1991) ("The deposit agreement constitutes the contract between the issuer of
the deposited securities, the depository and the holders of ADRs. ADR holders are deemed to
have agreed to all terms in the deposit agreement by their acceptance and holding of ADRs.").
Contractual choice-of-law clauses are routinely enforced, particularly when the country whose
law is selected has some nexus with the action.  *See Northrop Corp. v. Triad Int'l Marketing
S.A.*, 811 F.2d 1265, 1270 (9th Cir. 1987) ("Choice-of-law and choice-of-forum provisions in
international commercial contracts are 'an almost indispensable precondition to achievement of
the orderliness and predictability essential to any international business transaction,' and should
be enforced absent strong reasons to set them aside.") (quoting *Scherk v. Alberto-Culver Co.*, 417
U.S. 506, 516-20, 41 L. Ed. 2d 270, 94 S. Ct. 2449 (1974)); *see also Marine Midland Bank, N.A.
v. United Missouri Bank, N.A.*, 223 A.D.2d 119, 643 N.Y.S.2d 528, 530 (N.Y. App. Div. 1996)
("As a general rule, choice of law provisions . . . are valid and enforceable in this State.").

In response, Defendants cite *Batchelder v. Nobuhiko Kawamoto*, 147 F.3d 915 (9th Cir.
Cal. 1998).  However, *Batchelder* is readily distinguishable and actually supports Plaintiffs'
derivative standing.  In that case, American Honda and the holder of ADSs entered into a Deposit
Agreement, which, like the Deposit Agreement in this case, contained a choice-of-law provision,
§ 7.07.  That provision provided:

> This Deposit Agreement and the [American Depository] Receipts and all rights hereunder
> and thereunder and provisions hereof and thereof shall be governed by and construed in
> accordance with the laws of the State of New York, United States of America. It is
> understood that notwithstanding any present or future provision of the laws of the State of
> New York, the rights of holders of Stock and other Deposited Securities, and the duties
> and obligations of the Company in respect of such holders, as such, shall be governed by
> the laws of Japan.

*Batchelder*, 147 F.3d at 918.  The plaintiff's derivative action, brought pursuant to the Deposit
Agreement, was dismissed, the court holding that "the Deposit Agreement … expressly provides
that the law of Japan governs shareholder rights."  *Id.*  It explained:

The first sentence of § 7.07 provides that contract rights contained in the Deposit Agreement itself or in the ADR certificates, as well as the construction of the Deposit Agreement, are to be governed by the laws of New York. The second sentence of § 7.07, however, explicitly provides that Japanese law governs shareholder rights and the rights of holders of other Deposited Securities, including ADRs. Thus, if an ADR holder seeks to assert a right belonging to shareholders or a right not specifically granted to ADR holders in the Deposit Agreement, the laws of Japan apply. Section 7.07 is simply a choice-of-law clause.

*Id.*

Critically, unlike in *Batchelder*, there is no second sentence, the plain language of which directs the court to apply Swiss law to determine the existence and scope of the Plaintiff's rights. In the absence of that second sentence, effect must be given to the express New York choice of law provision in the Deposit Agreement.

Defendants are clearly cognizant of the New York choice-of-law provision in Novartis' Deposit Agreement, and spend a section of their motion trying to convince the Court why it shouldn't be enforced – even though they drafted it and required their own shareholders to sign it. See Motion at 8-9.

In essence, defendants claim that the Agreement's choice-of-law provision should be applied narrowly, i.e., to actions "brought "<u>directly</u> by Plaintiff for breach of <u>the provisions contained in the Deposit Agreement itself</u>." Motion, at 8:12-13 (emphasis is original). Thus, according to defendants, since this is a derivative action and the Agreement does not explicitly provide plaintiff with the right to sue derivatively, the New York choice-of-law clause doesn't apply. Defendants' interpretation is unsupported by the actual language of the Novartis ADS Agreement and the few cases they cite.

As noted above, the choice-of-law provision clearly provides: "The Deposit Agreement shall be governed by and construed in accordance with the laws of the State of New York." Ohn Decl., Ex. J. The parties are now bound by these terms in the contract. The Agreement unambiguously provides that New York law governs the parties' relationship, which plainly includes the rights of ADS holders and the duties and obligations of Novartis to such ADS holders.

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

Conversely, Novartis made absolutely no attempt to limit the scope of the choice-of-law provision to cover <u>only</u> direct actions by shareholders and premised <u>only</u> on rights explicitly stated in the Agreement itself. Novartis could have included such limitations on the choice-of-law clause if it wanted to (as Honda did in *Batchelder*). At best, all Novartis has shown is that the choice-of-law provision that it drafted is ambiguous on its scope, which ambiguity must be resolved against the drafting party.

Indeed, the few cases cited by Novartis undermine its own argument. For example, Novartis cites *Tomran, Inc. v. Passano*, 891 A.2d 336 (Md. 2006), and asserts that the court there "determined that a <u>similar</u> choice-of-law provision did not govern whether an ADS-holder could bring a derivative action on behalf of an Irish company because 'neither the Deposit Agreement nor the Receipts by their terms provide[d] [plaintiff] with the right to sue derivatively." Motion at 8:16-19 (emphasis added). Thus, according to Novartis, absent explicit mention of the right to bring a derivative action in the ADS agreement, a choice-of-law provision doesn't apply.

However, the Court's decision in *Tomran* was based on a critical <u>difference</u> in the choice-of-law provision. In *Tomran*, the choice-of-law provision stated in full:

> Section 7.6 – Governing Law. This Deposit Agreement and the Receipts shall be interpreted and <u>all rights hereunder and thereunder</u> and provisions hereof and thereof shall be governed by the laws of the State of New York.

*Tomran* at 343 (emphasis added). Plaintiff asserted that the choice-of-law provision mandated the application of New York law to determine whether it may proceed in a derivative action because, under the Agreement, the choice-of-law provision encompassed "all rights." The Court disagreed, holding that the parties' inclusion of the term "hereunder and thereunder" clearly indicated the parties' intent to limit "all rights" to those contained in the Agreement. *Id.* at 344. The Court cited similar results in other cases, including *Batchelder*, based on agreements containing the same "hereunder and thereunder" language. *Id.* at 345.

In another case cited by Novartis, *City of Sterling Heights Police & Fire Ret. Sys. V. Abbey Nat'l, PLC*, 423 F. Sup. 2d 348, 363-64 (S.D.N.Y. 2006), the Court reached the same conclusion after noting that the ADS Agreement contained the "identical" language used in



LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

*Tomran* – "hereunder and thereunder" – thereby reflecting a similar clear intention by the parties

to limit the choice-of-law provision to rights and obligations identified in the Agreement.

In the only other two cases cited by Novartis, *City of Harper Woods Employees' Ret. Sys.*

*v. Olver*, 577 F. Supp. 2d 124 (D.D.C. 2008) and *Seybold v. Groenink*, 2007 WL 737502

(S.D.N.Y. Mar. 12, 2007), the courts never even resolved the issue raised here, i.e., whether an

ADS choice-of-law provision covered the right to bring a derivative action. Rather, in *Seybold*,

the parties stipulated that Dutch law applied and the only issue was whether a "public policy"

exception to New York's internal affairs doctrine applied. Similarly, in *City of Harper Woods*,

the Court assumed that plaintiff had standing as an ADS holder but dismissed the action because

the underlying conduct did not give rise to a derivative action under the law of the United

Kingdom.[3/]

### B. Plaintiff Properly Alleges Demand Futility

Defendants assert that, even if New York law applies to demand futility, Plaintiff have

failed to allege sufficient facts. That is not the case.

Under New York law, "there are three types of circumstances in which shareholders may

proceed with derivative claims in the absence of a demonstrated attempt to persuade the board to

initiate an action itself. The complaint must allege with particularity that "(1) a majority of the

directors are interested in the transaction, or (2) the directors failed to inform themselves to a

degree reasonably necessary about the transaction, or (3) the directors failed to exercise their

business judgment in approving the transaction." *Matter of Converse Tech., Inc.*, 56 A.D.3d 49,

53-54, 866 N.Y.S.2d 10, 2008 N.Y. App. Div. LEXIS 7439, 2008 NY Slip Op 7595 (N.Y. 2008)

(citing *Marx v Akers,* 88 NY2d 189, 198, 666 N.E.2d 1034 (N.Y. 1996)).

### 1. Failure to Exercise Business Judgment

Defendants argue that the Complaint only challenges board inaction and so the business

judgment rule does not apply. This argument has no basis in law or fact. Defendants provide no

New York authority for this proposition. Rather, "demand on the Board is excused because of

---

[3]     Defendants do not dispute that, under Swiss law, Novartis' directors and officers can be
held liable in a derivative action.

futility when the challenged transaction was so egregious on its face that it could not have been the product of sound business judgment of the directors." *Matter of Comverse Tech., Inc.*, 56 A.D.3d at 56. The business judgment rule "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes," not actions taken in furtherance of illegitimate purposes. *Auerbach v. Bennett*, 47 NY2d 619, 629 (NY 1979). Here, among other things, Plaintiff has alleged that the individual defendants were board members during the time of the wrongful off-label marketing conduct and knew about the wrongdoing or "recklessly disregarded the wrongs complained of, " but did nothing to stop it. Compl., ¶¶ 5, 6, 91. Thus, Plaintiff alleges that the individual defendants affirmatively engaged in misconduct by essentially approving the illegal practice of off-label marketing.

Accordingly, a demand on the Novartis board is excused as futile because the challenged conduct, patently improper, illegal and dangerous off-label marketing, was so egregious that it could not have been the product of sound business judgment by the directors. This is particularly true where at least six of the individual defendants were members of the Novartis Audit and Compliance Committee, which is charged with ensuring the Company's compliance with the laws and regulations, but failed to stop the alleged misconduct. *Id.* ¶ 90. Indeed, the approval of over a decade's worth of off-label marketing "simply does not qualify as a legitimate exercise of business judgment. . . . [P]assively rubber-stamping the acts of the active corporate managers does not exempt directors from culpability, and the business judgment rule does not protect them (see *Barr v Wackman*, 36 NY2d 371, 381, 329 N.E.2d 180, 368 N.Y.S.2d 497 [1975])." *Matter of Comverse Tech., Inc.*, 56 A.D.3d at 56 (denying defendants' motion to dismiss where derivative plaintiff properly alleged demand futility for failure to stay informed and exercise business judgment).

### 2. Failure to Stay Informed

"Demand is excused because of futility when a complaint alleges . . . that the board of directors did not fully inform themselves about the challenged transaction to the extent reasonably appropriate under the circumstances." *Matter of Comverse Tech., Inc.*, 56 A.D.3d 49,

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

54-55 (N.Y. 2008) (citing *Marx*, 88 NY2d at 200)). Here, Plaintiff alleges that demand would be futile because, among other things, the board "recklessly disregarded the wrongs complained of." *Id.* ¶ 91. Moreover, Plaintiff alleges that the individual defendants had a duty to be informed of all material information reasonably available and act with the requisite care in discharging his or her duties. *Id.* ¶ 93. In this regard, at least six of the individual defendants were members of the Novartis Audit and Compliance Committee. *Id.* ¶ 90. As such, the individual defendants were obligated to conduct a full and adequate investigation into the alleged misconduct and ensure that the Company was in compliance with applicable laws and regulations. *Id.* However, individuals defendants failed to do so. *Id.* In essence, Plaintiff alleges that the board failed to exercise reasonably appropriate oversight of the off-label marketing. Moreover, there were grounds for inquiry by these directors, but no inquiry was made, rendering demand futile.

Indeed, "[i]n view of the illegal purpose of the transactions, their magnitude and duration, their timing, and the identity of their beneficiary, the matter should have" resulted in an investigation stopping the misconduct. *Miller v Schreyer*, 257 AD2d 358, 362, 683 N.Y.S.2d 51 (N.Y. 1999). However, the individual defendants did not fully inform themselves about the off-label marketing to the extent reasonably appropriate under the circumstances and so a demand on the board should be excused.

### 3. Interest

Plaintiffs have also properly alleged that a majority of the Novartis board was interested in the transaction or wrongdoing. Compl., ¶¶ 80-92. In their opposition, Defendants again rely on inapplicable Delaware law or unpublished New York decisions. "Under New York law, a director may be interested under either of two scenarios: self-interest in the transaction or loss of independence due to the control of an interested director. . . . Directors are self-interested in a challenged transaction where they will receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally." *Matter of Comverse Tech., Inc.*, 56 A.D.3d at 56.

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

Here, Plaintiffs have alleged that all of the individual defendants received substantial compensation and fees for their service as directors during the relevant time period based on Novartis's performance. Compl., ¶ 90. Moreover, defendant Jetzer was paid substantial sums for providing consultancy services to Novartis for governmental relations. Likewise, defendant Zinkernagel was paid a significant amount for serving as the board's delegate to the scientific advisory boards of the Novartis research foundation and institute for tropical diseases. *Id.* As such, the individual defendants were self interested precisely because they received a direct financial benefit from the transactions or wrongful conduct, which is different from the benefit to shareholders generally. *Matter of Comverse Tech., Inc.*, 56 A.D.3d at 56.

### C.  This District Is An Appropriate Forum

Defendants moving to dismiss a case based on the doctrine of forum non conveniens bears the burden of making a compelling showing that an adequate alternative forum exists and that the balance of relevant private and public interest factors strongly favors dismissal. *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1118 (9th Cir. 2002); *Altmann v. Republic of Austria*, 317 F.3d 954, 973 (9th Cir. 2002), *aff'd sub nom. Republic of Austria v. Altmann*, 541 U.S. 677, 124 S. Ct. 2240 (2004); *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1334-35 (9th Cir. 1984). Forum non conveniens "is 'an exceptional tool to be employed sparingly, [not a] . . . doctrine that compels plaintiffs to choose the optimal forum for their claim.'" *Dole*, 303 F.3d at 1118 (*quoting Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir. 2000), *cert. denied sub nom. San Francisco Baseball Associates, L.P. v. Ravelo Monegro*, 531 U.S. 1112 (2001)) (emphasis added).

Ordinarily, a plaintiff's choice of forum will not be disturbed unless the private interest and public interest factors strongly favor trial in a foreign country. *See Gates Learjet*, 743 F.2d at 1334-35. This is particularly true where, as here, the plaintiff is a U.S. citizen, and/or an individual party of relatively modest means compared with the defendants. *See Piper Aircraft Co. v. Reyno*, 454 US. 235, 256 (1981); *Carey v. Bayerische Hypo and Vereinsbank AG*, 370 F3d 234, 238 (2d Cir. 2004).

LAW OFFICES
COTCHETT,
PITRE
& MCCARTHY

The standard to be applied to a motion for dismissal on grounds of forum non conveniens "'is whether . . . defendants have made a <u>clear showing</u> of facts which . . . establish such <u>oppression and vexation</u> of a defendant as to be out of proportion to plaintiff's convenience, which may be shown to be slight or nonexistent. . . .'" *Ravelo Monegro*, 211 F.3d at 514 (*quoting Cheng v. Boeing Co.*, 708 F.2d 1406 (9th Cir. 1983) (emphasis added)).

Defendants have not met their heavy burden of disturbing Plaintiff's choice of forum and establishing forum non conveniens as to the Northern District of California. Although Switzerland may be an adequate alternative forum, Defendants have not established that the balance of relevant public and private factors favor Switzerland.

### 1. Private Interest Factors Favor Adjudication in This District

Defendants correctly note that the relevant private interest factors are: (1) the residence of the parties and the witnesses and the forum's convenience to them; (2) access to physical evidence and other sources of proof; (3) the cost of bringing witnesses to trial; and (4) the enforceability of the judgment. *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1145 (9th Cir. 2001) (citations omitted).

### a. On Balance, This District is More Convenient for the Parties and Witnesses

The convenience of the parties and witnesses is better served by maintaining the suit in this District. Predictably, Defendants have focused on the fact that Novartis and seven individual defendants reside in Switzerland. However, Plaintiff lives in Arizona; two individual defendants live in Massachusetts; and three individual defendants live in Germany. Thus, Switzerland would not be a convenient forum for the six parties that reside outside that country.

Moreover, and critically, Defendants do not even address the other key witnesses. In this regard, this Court is required to examine the "materiality and importance of the anticipated witnesses' testimony" before considering the competing forums' accessibility for them (*Gates Learjet Corp. v. Jensen,* 743 F.2d 1325, 1335 (9th Cir. Ariz. 1984); *Lueck v. Sundstrand Corp.*, 236 F.3d at 1146), and it is Defendants' burden to establish such materiality.

Here, the underlying conduct and events at issue involve the dangerous off-label marketing that occurred in this District and other parts of the United States. Thus, many of the

individual witnesses that would testify regarding Chiron's promotion of TOBI, including the former Director of TOBI Global Marketing at Chiron, are located in this district or in California. Compl., ¶¶ 22, 40. Chiron is located in Emeryville, California. Moreover, Defendants have admitted that the U.S. Attorneys' office for the Northern District of California is conducting an investigation regarding the marketing and promotion of TOBI and that there is another relevant confidential matter pending in this District. Ohn Decl., Ex. A.

In addition, Defendants have admitted that there is currently a governmental investigation regarding Trileptal pending in the Eastern District of Pennsylvania. Ohn Decl., Ex. A. Clearly, this District would be more convenient for witnesses related to this investigation than Switzerland.

Accordingly, on balance, the convenience of the parties _and_ key witnesses favors maintaining this action in this District.

### b. Access to Evidence and Other Sources of Proof

This factor does not favor Switzerland. To the extent relevant documents are located in Europe, given today's technology, there is no reason such relevant documents could not be produced quickly and efficiently via mail and electronic means. Moreover, the evidence regarding underlying off-label marketing would be more accessible in this District, particularly given the two pending investigations in this District and the one in the Eastern District of Pennsylvania. Finally, regardless of whether the action is venued in Switzerland or the United States, depositions would most likely need to be taken in both countries.

### c. Cost of Bringing Witnesses to Trial

On balance, the costs of bringing witnesses to trial favors this District. Again, Defendants only focus on the party witnesses that reside in Switzerland. However, for the numerous key party and non-parties witnesses that reside in the United States, and particularly those involved with underlying off-label marketing and multiple pending government investigations, this District would clearly be the more cost effective forum.

#### d. Enforceability of Judgment

This factor does not favor Switzerland. While Defendants speculate about the enforceability of a judgment from this Court in other countries, it remains to be seen during merits-phase discovery whether and which Defendants have assets in California or other parts of the United States on which, if necessary, Plaintiff could levy to collect on a judgment. Thus, this factor does not favor Defendants.

### 2. The Public Interest Factors Favor This District

The relevant public interest factors that the Court should consider here are

(1) the local interest in the lawsuit; and

(2) the Court's familiarity with governing law.

*Lueck v. Sundstrand Corp.*, 236 F.3d at 1147. As with the private interest factors, to the extent that these factors are relevant in this case, they favor Plaintiff, not Defendants.

#### a. This District Has a Strong Interest in the Lawsuit

This Court has already demonstrated the strong local interest in this lawsuit by denying Defendants' venue challenge and holding that this action is properly venued in the Northern District of California. Defendants have not offered any evidence to change that position. Indeed, a substantial portion of the allegations concern conduct, parties and evidence that relate to this district, including Chiron's promotion of TOBI. The off-label drug marketing that is the substantive basis for this action and presents a grave danger to California citizens. As such, this District's U.S. Attorneys' Office is currently investigating the marketing and promotion of TOBI and that there is another relevant confidential matter pending in this District. This action should be adjudicated in this Court.

Defendants urge that Switzerland has a "particularly strong interest in deciding whether officers and directors" of a Swiss corporation violated Swiss law. Plaintiff does not deny that Switzerland has some interest in this dispute. However, as discussed above, Swiss law does not even apply to this action.

Furthermore, it would be against public policy for an ADS shareholder not to have the right of a derivative action against a foreign company that purposefully avails itself of American

capital and the protection of American laws.  Indeed, "the national interest in furthering the policies of the American securities regulatory system militates in favor of [maintaining this action in this District]. . . . ADRs are the preferred method for trading in foreign securities in the United States in part because they are a more secure investing option for Americans than purchasing the foreign corporation's stock directly due to the fact that they are subject to reporting and regulatory requirements under the Securities Act  and the Exchange Act.  Allowing . . . [the individual defendants and Novartis] to escape the . . . jurisdiction of the federal courts would in essence nullify the regulatory protection that American investors seek when they purchase ADRs.  If ADRs are subject to the United States securities regulatory regime in theory, but are exempt in practice due to the inability of American courts to exercise . . .  jurisdiction over the foreign corporation issuer, one would expect them to be considered a less attractive option for American investors." *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 372-73 (3rd Cir. N.J. 2002) (denying motion to dismiss based on personal jurisdiction of foreign corporate defendant); *E.ON AG v. Acciona, S.A.*, 468 F. Supp. 2d 559, 587-88 (S.D.N.Y. 2007) (denying motion to dismiss for forum non conveniens).

### b.     Court's Familiarity with Governing Law

This factor favors Plaintiff.  As an initial matter, there is no conflict of law because, as discussed above, New York Law applies based on the parties contractual choice of law provision in the Deposit Agreement.  Certainly, this Court is more familiar with New York law and better capable of interpreting New York law than a court in Switzerland.  Moreover, even if foreign Swiss law needed to be applied, Defendants have not established any compelling reason why Swiss law is different than New York law.

As discussed above, Defendants have failed to carry their heavy burden of establishing that the exceptional doctrine of forum non conveniens applies to this case.  Consequently, the Court should deny Defendants' motions to dismiss on this ground.

### D.     Plaintiff Properly Alleges Continuous Ownership

Defendants contend that Plaintiffs have not alleged ownership of Novartis ADS shares from the time of the alleged misconduct to the present.  Defendants' MTD at 22.  Defendants are

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY

simply wrong. The Complaint plainly states that "Plaintiff is currently an owner of Novartis stock" and "has continuously held Novartis stock at all times relevant hereto." Compl., ¶ 81. Nonetheless, should the Court be inclined to dismiss the Complaint on the ground that Plaintiff has failed to allege the specific date on which he purchased Novartis stock, Plaintiff respectfully requests leave to amend to do so. In this regard, where Plaintiff has alleged a course of conduct and a continuing scheme of wrongdoing by the members of the board, the Complaint "should not be dismissed on defendants' contention that the claims actually arose prior to the time that plaintiff acquired stock." *In re Bank of New York Derivative Litig.*, 173 F. Supp. 2d 193, 198 (S.D.N.Y. Nov. 2001); citing *Bateson v. Magna Oil Corp.*, 414 F.2d 128, 130 (5th Cir. 1969). The appropriate test is not whether a particular transaction occurred prior to plaintiffs acquiring the stock, but instead, "whether the wrong complained of is in reality a continuing wrong . . . ." *Bank of New York*, 173 F. Supp. 2d at 198.[4]

## VI. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that Defendants' motion to dismiss be denied in its entirety. Alternatively, Plaintiff requests leave to amend the Complaint.

Dated: March 27, 2009                    COTCHETT, PITRE & McCARTHY


                                          By: _____/s/_____
                                                   GERALD S. OHN

                                          *Attorney for Plaintiff GREG SARANDI, Trustee of Next Phase Marketing, Inc. Defined Benefit Plan and Trust, derivatively and on behalf of Novartis AG (Novartis. Inc.)*

---

[4]       In the event the Court grants the motion, Plaintiff respectfully requests leave to amend, particularly given Defendants' refusal to provide discovery relating to the allegations at issue. Further, any issue regarding Plaintiff's standing as an ADS shareholder can be rectified merely by adding an existing Novartis Shareholder or joining JP Morgan, the record holder.

LAW OFFICES
COTCHETT,
PITRE
& McCARTHY